[Civ. No. 43982. First Dist., Div. Four. Feb. 5, 1980.]

JOHN PLAGGMIER et al., Plaintiffs and Appellants, v.
CITY OF SAN JOSE et al., Defendants and Respondents;
ALMADEN SHOPPING CENTER, LTD.,
Real Party in Interest and Respondent.

**COUNSEL**

John Marshall Collins, Corinne A. Tomeo and Decker & Collins for Plaintiffs and Appellants.

Robert J. Logan, City Attorney, and Diane M. Lee, Deputy City Attorney, for Defendants and Respondents.

John M. Ottoboni, William D. McHugh and Ruffo, Ferrari & McNeil for Real Party in Interest and Respondent.

OPINION

RATTIGAN, J.—This appeal involves a site development permit issued by respondent City of San Jose (hereinafter the City) to respondent Almaden Shopping Center, Ltd., a limited partnership (Almaden), in connection with its proposed construction of a shopping center on an eight-acre tract of land located within the territorial limits of the City. Appellants are individuals, and an association of individuals, who own and live on residential parcels in the immediate vicinity of the tract. They petitioned the superior court for a writ of mandate requiring the City to vacate the permit. Their petition named Almaden as "Real Party In Interest" and the City, its planning commission, and its planning director as respondents. All four answered the petition. After a nonjury trial, the court filed exhaustively detailed findings of fact and conclusions of law adverse to appellants and entered judgment denying their petition. They appeal from the judgment.

*Facts*

The material facts, and the pertinent provisions of state and local law, are not disputed. The record supports the following recitals, which principally quote the trial court's findings:

Almaden owned the eight-acre tract at all pertinent times. On April 27, 1977, it submitted to the City an application for a site development permit for the construction of a shopping center on the tract and a separate application "for environmental clearance" of the project. The application for environmental clearance was presented and processed pursuant to provisions of article XX of the San Jose Municipal Code which the City had enacted by way of implementing parallel provisions of the California Environmental Quality Act (Pub. Resources Code, div. 13, commencing with § 21000 [hereinafter CEQA]) and the State EIR Guidelines promulgated by the Secretary of the Resources

Agency pursuant to CEQA. (Cal. Admin. Code, tit. 14, commencing with § 15000.)[1]

When the second application was submitted, a committee of the City's planning department conducted an "initial study" to determine whether the proposed project required the preparation of an "environmental impact report" or, in the alternative, a "negative declaration."[2] On the basis of information compiled in the study, the committee recommended to the planning director that a negative declaration be prepared. He prepared a declaration in which he tentatively certified his determination that the project, as described in it, would "not have a significant effect on the environment." He also prepared a document giving notice of the declaration under the caption "Public Notice."

CEQA and the State EIR Guidelines provide that advance "public notice" of a proposed negative declaration shall be given by one of three alternative methods which include "[d]irect mailing to owners of contiguous property." (§ 21092.)[3] Substantially identical provisions ap-

---

[1]Section (or §) references are to the Public Resources Code, and to provisions of CEQA appearing in it, except where indicated otherwise. Reference to a Guideline cites the indicated section of title 14 of the California Administrative Code. CEQA provides that "[a]ll public agencies shall adopt by ordinance, resolution, rule, or regulation, objectives, criteria, and procedures for the evaluation of projects and the preparation of environmental impact reports and negative declarations pursuant to this division [i.e., to CEQA]." (§ 21082; see fn. 2, *post.*) The State EIR Guidelines are promulgated by the Secretary of the Resources Agency "for the implementation" of CEQA by "public agencies" (§ 21083), and are "to be followed" by them in implementing it. (Guideline 15000.) It is undisputed that the City of San Jose is a "public agency" subject to the mandates of CEQA and of the State EIR Guidelines, and a "local agency" within the meaning of both. (See §§ 21062, 21063; Guidelines 15000, 15005, 15031, 15038.) It is also undisputed that the pertinent provisions of article XX of the San Jose Municipal Code were enacted by the City for the implementation of CEQA. Our citations to the San Jose Municipal Code refer to sections appearing in its article XX.

[2]CEQA defines a negative declaration as "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064; see also § 21061 [defining environmental impact report].)

[3]The statute reads in full as follows: "21092. Any public agency which is preparing an environmental impact report or *a negative declaration* shall provide public notice of such fact within a reasonable period of time prior to final adoption by the public agency of such environmental impact report or negative declaration. Notice shall be given to all organizations and individuals who have previously requested such notice *and shall also be given by at least one* of the following procedures:

"(a)   Publication, no fewer times than required by Section 6061 of the Government Code, by the public agency in a newspaper of general circulation in the area affected by the proposed project.

pear in section 20302.1, subdivision (d), of the San Jose Municipal Code.[4]

In processing an application for environmental clearance such as Almaden's, the City followed the policy of giving notice of a proposed EIR or negative declaration by the method of "direct mailing to owners of property contiguous to the project," and not by any other method. (See fns. 3 and 4, *ante*.) It also required the applicant to identify the parcels of "contiguous" property involved; to ascertain the names and

---

"(b)  Posting of notice by the public agency on- and off-site in the area where the project is to be located.

"(c)  Direct mailing to owners of contiguous property.

"The alternatives for providing notice specified in subdivisions (a) to (c), inclusive, shall not preclude a public agency from providing additional notice by other means if such agency so desires, nor shall the requirements of this section preclude a public agency from providing the public notice required herein at the same time and in the same manner as public notice otherwise required by law for such project." (Italics added.)

Identical language is used in parallel sections of the State EIR Guidelines. (See Guidelines 15083, subd. (d), and 15085, subd. (d)(2).)

[4]In its pertinent context, this provision reads:

"20302.1. . . . A Negative Declaration shall be prepared in accordance with this Part.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(d)   . . . Notice of the preparation of a Negative Declaration shall be provided prior to its adoption by the Director of Planning to:

"(1)  All organizations and individuals who have previously requested such notice and have provided the Director with a self-addressed stamped envelope for said purpose; and

"(2)  By direct mailing to owners of property contiguous to the project, or by posting of notice on and off site in the area where the project is to be located, or by publication in a newspaper of general circulation in the area affected by the proposed project no fewer times than required by Section 6061 of the Government Code."

Subdivision (d) further provides that a negative declaration "shall not" be adopted by the planning director "until at least five (5) working days have elapsed from the date of such notice"; that the director "shall" meanwhile consider "all written comments received" on it before deciding whether to adopt it or to require the preparation of an EIR; and that the notice "shall" include notice that a negative declaration "shall become final on the sixth (6th) working day after its adoption unless a written protest thereto is filed with the Director" within the five-day period.

Subdivision (e) of section 20302.1 ("Public Review") conversely provides that a negative declaration "shall" become final on the sixth working day after its adoption unless a written protest is filed within the five-day period. Subdivision (f) ("Protest. . .") provides that the filing of a timely protest suspends the finality of a negative declaration "unless and until" the City's planning commission sustains it; specifies the procedure for filing a protest; and requires the City's planning commission to conduct a hearing on it upon not less than 10 days' written notice to the protestant and the applicant. Subdivision (g) ("Protest Hearings") provides for the conduct of the hearing; authorizes the planning commission to order the preparation of an EIR at the conclusion of the hearing; and alternatively authorizes the commission to "sustain" the negative declaration at that time, in which event it "shall forthwith become final."

addresses of their owners from the "equalized assessment roll" maintained by the Santa Clara County Assessor; and to deliver to the City's planning department stamped envelopes, addressed to the persons thus identified, for use in mailing the notice. The City's deputy planning director testified that this practice was employed because "the last equalized assessment roll is . . . the most available and most accessible on a continuing basis record of owners of property." He also testified that the City similarly "relied upon" the equalized assessment roll to identify persons to whom notices were to be given in "other permit processes" involving such matters as rezoning and variances.

In compliance with the City's requirements, a consultant employed by Almaden first determined that there were eleven parcels of land "contiguous" to the eight-acre tract where the proposed shopping center was to be built. He then obtained the names and addresses of their owners as shown in the current equalized assessment roll, prepared 11 stamped envelopes addressed to these persons, and delivered the envelopes to the City's planning department as part of the application for environmental clearance filed there on April 27, 1977. Using these envelopes, the planning director mailed out copies of the "Public Notice" and the proposed negative declaration on May 13, 1977.

The "Public Notice" informed each addressee of the proposed negative declaration enclosed with it. Pursuant to section 20302.1 of the San Jose Municipal Code, the notice stated that the declaration was to be "considered for adoption" on May 20, 1977; that "comments" on it were invited; and that its adoption on May 20, 1977, might be protested in writing "prior to May 31, 1977 to be heard by the City Planning Commission." (See fn. 4, *ante.*) It also stated that payment of a "$50 protest fee" was required. The proposed negative declaration enclosed with the notice informed the addressee that a "protest of a Negative Declaration will be heard by the City Planning Commission at the earliest possible date." (See *ibid.*)

The planning director adopted the proposed negative declaration on May 20, 1977, as noticed. No one protested it in writing prior to May 31, 1977. It therefore became final on that date by operation of San Jose Municipal Code section 20302.1, subdivision (e). Belated opposition to the application for a site development permit developed later, but the City eventually granted it. A permit was issued to Almaden on October 17, 1977.

It was also established at the trial, however, that the "Public Notice" and the proposed negative declaration had not been mailed to all the owners of property "contiguous" to the project site on May 13, 1977, because some of them were not identified as such on the equalized assessment roll from which their names and addresses were obtained by Almaden's consultant. The Santa Clara County Assessor compiled and published the roll pursuant to statute. (See Rev. & Tax. Code, pt. 2, ch. 3, art. 6 [Assessment Roll], commencing with § 601; see also *id.*, § 2050 et seq.) He published it annually, on or about July 1, for the tax year commencing on that date. The roll published each July 1 was the "current official equalized assessment roll" until the publication of the next one a year later. The roll "as published" was "sold to governmental agencies and members of the public."

The roll identified all parcels of land in Santa Clara County with numbers assigned to them by the assessor. It also showed the name and address of the record owner of each parcel as of the March 1 preceding the July 1 publication date. In this chronology, the roll currently in effect in April and May of 1977 (when Almaden's application for environmental clearance was submitted and processed) was the 1976-1977 roll published by the assessor on July 1, 1976, showing record ownerships as of March 1, 1976.

The names and addresses of owners shown on that roll were thus frozen as of March 1, 1976, but the assessor also maintained records, called "updates," which reflected changes in the record ownership of any parcel during the 1976-1977 tax year. His staff ascertained changes in the county recorder's office daily, noted them as "updates" in his records for the affected parcels, and reproduced them on microfiche every four weeks. The "updates" were not part of the "official equalized assessment roll." The assessor accordingly did not distribute them from his office, but he made them readily available to the public there. "Upon request," personnel of the office would "tell members of the public how to find more up-to-date information than that contained in the equalized assessment roll."

One of the eleven "contiguous" parcels identified by Almaden's consultant was designated on the 1976-1977 equalized assessment roll as No. 581-10-069. It had been owned of record by Jimmy and Sue Morrison on March 1, 1976. The roll accordingly showed their names as its owners and stated their address. Appellants Stephen and Noel William-

son became the record owners of parcel No. 581-10-069 on September 22, 1976. The record on appeal does not show when the Williamsons were first identified as such in the assessor's office, but it was established without dispute that the microfiche "updates" showed their names as the owners of the parcel, and their mailing address, at least as early as February 25, 1977.

Almaden's consultant identified the Morrisons as the owners of parcel No. 581-10-069 when he resorted to the 1976-1977 equalized assessment roll as such. He did not learn that the Williamsons owned the parcel currently (i.e., in April of 1977) because he examined a copy of the roll he kept in his office. He did not look elsewhere, and he testified that he was unaware of the "updates" which were available in the assessor's office. The City's deputy planning director testified that the planning department sometimes checked lists of "contiguous property owners...for accuracy once they're delivered to it." The department similarly used its own copy of the current equalized assessment roll for this purpose, and did not maintain updated records of parcel ownership. The deputy director was also unaware of the "updates" or their availability at the assessor's office.

In consequence of these events and omissions, the stamped envelope prepared by Almaden for the owner of parcel No. 581-10-069 was addressed to the Morrisons; the planning director mailed the notice and proposed negative declaration to them as its owners; and no notice was mailed to the Williamsons, at any time, despite the fact that they had owned the parcel for almost eight months when the mailing took place. They received no notice of Almaden's proposed construction project until a neighbor informed them of it in June of 1977, after the negative declaration had been adopted without protest. They both testified that they would have protested the proposed negative declaration, and paid the protest fee, if they had received timely notice of it.

### The Trial Court's Determinations

Appellants asserted below that the City's failure to include the Williamsons in the mailing of May 13, 1977, had the effect of invalidating all the subsequent administrative proceedings. After reciting most of the above-summarized events in its findings of fact, the trial court rejected this contention in four further "findings." They included conclusions of law, and the court substantially reiterated them as such,

but the court's essential determinations are more clearly stated in the four "findings." We quote them as follows:

"23.   In giving Notice of Preparation of Negative Declaration for this project, the City of San Jose and its agents used the current Equalized Assessment Roll...to determine the identity and addresses of landowners contiguous to the project for purposes of conveying Notice...; and this means of giving notice was adequate and reasonable for this purpose.

"30.   The use by the City...of the last Equalized Assessment Roll for determining the owners of...parcels contiguous to the project for the purposes of giving notice under San Jose Municipal Code section 20302.1(d) is reasonable, not an abuse of discretion, and not a violation of due process of law.

"32.   The meaning of the term 'owners of property contiguous to the project' as that term is used in San Jose Municipal Code section 20302.1, which is applied by the City...Planning Department, is owners as shown on the last Equalized Assessment Roll of properties adjacent to or directly across a city street from the project.... The...[interpretation of this term]...applied by the...Planning Department...[is]...reasonable and consistent with Article XX of the San Jose Municipal Code, the California Environmental Quality Act...and the Guidelines for Implementation of the California Environmental Quality Act...promulgated by the Secretary for Resources, and said definitions are adopted by this Court.

"50.   Petitioners [i.e., appellants] have failed to exhaust their administrative remedies in opposing the granting of the site development permit and the adoption of a Negative Declaration thereon in that they failed to file a timely protest as required by San Jose Municipal Code section 20302.1."

The judgment denying appellants' petition for a writ of mandate was entered on the basis of these determinations. They filed a timely notice of appeal and petitioned this court for a "stay order" pursuant to Code of Civil Procedure section 923. We granted the petition and made an order staying enforcement of the judgment, and the operation of the site development permit and all related permits, until the further order of this court.

*Review*

■ Appellants contend that the negative declaration which was adopted and purportedly became final in May of 1977 was void, and that the site development permit issued later is void in consequence, because notice of the declaration as proposed was not mailed to the Williamsons on May 13.

Section 21092, Guideline 15083, subdivision (d), and San Jose Municipal Code section 20301.1, subdivision (d), uniformly permitted the City to give "public notice" of the proposed negative declaration by newspaper publication in the area where Almaden's tract is located, *or* by posting the tract and its vicinity, *or* by "direct mailing" to the owners of property "contiguous" to it. (See fns. 3 and 4, *ante.*) The City having selected the "direct mailing" method in this case, as in others, appellants first urge that its failure to mail the notice to the Williamsons was fatal to the subsequent administrative proceedings because the language of all three enactments is otherwise "mandatory" and not "directory."

Subject to the optional choice of method, each of the three enactments provides that notice "shall" be given by one of the prescribed methods or another. The interpretation of section 21092, and of CEQA generally, is controlled by omnibus sections of the Public Resources Code which provide that "'[s]hall' is mandatory" in its construction except where "the context otherwise requires." (§§ 5, 15.) The State EIR Guidelines include a similar provision for their construction. (See Guideline 15015, subd. (a).)[5] The language of San Jose Municipal Code section 20302.1 is to be read subject to these provisions because it is wholly derived from the two state sources. (See fn. 1, *ante.*)

■ The provisions establish that the notice requirements in the three enactments are "mandatory" to the extent that the City was under an "obligatory duty" to comply with them. It does not necessarily follow that they are "mandatory" in the sense that failure to comply with them will have the effect of "invalidating the governmental action[s]" to which they relate. (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606].) Whether they are "manda-

---

[5]"15015. Terminology. The following words are used to indicate whether a particular subject in the Guidelines is mandatory, advisory, or permissive: [¶] (a) 'Must' or 'shall' identifies a mandatory element which all public agencies are required to follow."

tory" in that consequential sense is to be determined from the legislative intent underlying their enactment. (*Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1]; see *Morris* v. *County of Marin, supra*, at pp. 908-910.)

■ "In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose, and the courts will look to see whether the provision is of the essence of the thing to be accomplished." (Citations omitted.) (*Pulcifer* v. *County of Alameda, supra*, 29 Cal.2d 258 at p. 262 [quoted with approval in *Morris* v. *County of Marin, supra*, 18 Cal.3d 901 at p. 910]. See also *People* v. *McGee* (1977) 19 Cal.3d 948, 961-962 [140 Cal.Rptr. 657, 568 P.2d 382].)

The Legislature has determined in CEQA itself, at exhaustive length, that the enactment serves a high public purpose in providing for the protection of the environment and the maintenance of its quality. (§§ 21000-21003.) CEQA effectively imposes upon every "public agency" a duty to disapprove a project, if it will have significant effects on the environment as proposed, unless and until the agency has considered "feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (§ 21002.) The agency's decision to prepare an EIR invokes the duty. (See §§ 21002.1, 21061.) The adoption of a negative declaration operates to dispense with the duty because it is a decision that the proposed project will not affect the environment at all. (See § 21064.) Its terminal effect on the environmental review process means that it is vitally important to the purpose of CEQA. (See *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 80-81, 85-86 [118 Cal.Rptr. 34, 529 P.2d 66]; Comment, *Environmental Decision Making Under CEQA: A Quest For Uniformity* (1977) 24 UCLA L.Rev. 838, 857-866.) The opportunities to protest it, and to be heard before its finality, are consequently important to that purpose as well.

Section 21092 and Guideline 15083, subdivision (d), offer these opportunities by providing for "public notice" of a proposed negative declaration "within a reasonable period of time prior to final adoption." (See fn. 3, *ante*.) Neither source expressly provides for protest and a

hearing at that time, but the availability of both is a logical extension of the requirement that notice be given in advance of "final adoption." CEQA broadly invokes the policy of permitting full public participation throughout the environmental review process it commands. (See, e.g., § 21000, subd. (e); § 21003, subd. (b).) The State EIR Guidelines urge this policy upon all public agencies pursuing the process, and address it to the negative declaration stage in particular. (See Guidelines 15164 and 15083, subd. (e).)[6]

The City has effectuated the policy at that stage by providing in San Jose Municipal Code section 20302.1, subdivisions (e) through (g), that a proposed negative declaration may be protested and that it will not become final until protests are heard by the planning commission. (See fn. 4, *ante.*) ▮ In the definitive language of the Supreme Court decisions previously quoted, the protest procedure "subserves the public purpose" of CEQA itself. Because the purpose will be utterly frustrated by a failure to comply with the provisions of law requiring "public notice" of a proposed negative declaration, and of the protest and hearing procedure established locally, those provisions are "of the essence of the thing to be accomplished." (*Pulcifer* v. *County of Alameda, supra,* 29 Cal.2d 258 at p. 262.) They are accordingly "mandatory" in the sense that noncompliance with them will have the effect of "invalidating the governmental action[s]" which follow. (*Morris* v. *County of Marin, supra,* 18 Cal.3d 901 at p. 908.)

▮ The trial court apparently took this view, but determined in effect that the City *complied* with the requirement of "direct mailing" to the owners of "contiguous" property when it mailed notice of the proposed negative declaration to those "owners" as they were shown on the last equalized assessment roll published by the Santa Clara County Assessor. (See finding No. 32, quoted *ante.*) We disagree with this determination.

---

[6]These Guidelines respectively provide: "15164. Public Participation. While the Environmental Quality Act of 1970 does not require formal public hearings at any stage of the environmental review procedure, it is a widely accepted desirable goal of this process to encourage public participation. All public agencies adopting implementing procedures in response to these Guidelines should make provisions in their procedures for wide public involvement, formal and informal, consistent with their existing activities and procedures, in order to properly receive and evaluate public reactions, adverse and favorable, based on environmental issues."

"15083.... [¶] (e) Public Review. The Negative Declaration *shall* be made available to the public with sufficient time before the project is approved to provide an *opportunity for members of the public to respond to the finding....*" (Italics added.)

The term "owner" is not defined in CEQA, nor in the State EIR Guidelines, nor in the pertinent provisions of the San Jose Municipal Code, but it is not qualified in point of time where it appears in any of them. The requirement that "public notice" of a proposed negative declaration be given is obviously intended to reach those members of segments of the public who have a current interest in the declaration and its consequences. The equalized assessment roll is by definition an annual, one-time compilation of the "owners" of affected land as they appeared of record at a fixed date which might be one year or more past at any point during the life of the roll. A person identified on it as an "owner" of a particular parcel, but who had divested himself of its ownership since the roll was published, is unlikely to be interested in an environmental decision that no longer affects him.

The practice of mailing notices to persons who *were* "owners" thus involves an immeasurable risk that the result will be—as it was here—a failure to communicate with persons who have a stake in the noticed action because they *are* "owners." The risk is such that the practice is essentially unreliable as a generator of public participation in the environmental review process as contemplated in CEQA (see § 21000, subd. (e); § 21003, subd. (b)), and of the public response to a proposed negative declaration which is expressly anticipated in the State EIR Guidelines and in San Jose Municipal Code section 20302.1. (See fns. 6 and 4, *ante.*) The practice is accordingly inconsistent with these sources, and with the patent purpose of the notice requirements exacted in all of them. It is accordingly to be deemed noncompliance with the "direct mailing" method once that method has been selected as the sources permit.

Respondents defend the trial court's determination to the contrary by arguing that the mandatory requirements are designed to give "public notice" of a proposed negative declaration, as distinguished from notice to identifiable individuals who must be reached without exception; that the communication of notice by "direct mailing" to *some* of the contiguous owners was at least as effective as the limited notice likely to be achieved through the alternatively permissible methods of publication or posting; and that various other statutes permit notices to be given to "owners" of property as shown on the current equalized assessment roll for the county involved.

The first two arguments urge the essential point that *substantial* compliance with the "direct mailing" method will obviate *non*com-

pliance with it once that method has been selected at the City's option. It is true that "public notice" of a proposed negative declaration is the stated objective of section 21092, of Guideline 15083, subdivision (d), and of San Jose Municipal Code section 20302.1, subdivision (d). (See fns. 3 and 4, *ante*.) It is also true that published or posted notice may fall short of achieving that objective to the extent that it will not be seen or read by all persons it is intended to reach. (See, e.g., *In re La Opinion* (1970) 10 Cal.App.3d 1012, 1019 [89 Cal.Rptr. 404].) However, the Legislature has effectively determined in section 21092 that the "direct mailing" method, once permissibly selected, will achieve the objective of "public notice" only if it is to be a class defined as the "owners" of contiguous property. Because the term designating the class is all-inclusive, it must be deemed exclusive as well. Moreover, the acceptance of *substantial* compliance on the facts of one case will permit its rejection or extension on the facts of another. The consequent disparity in the enforcement of CEQA could frustrate uniformity in its application. Substantial compliance with the "direct mailing" method of giving notice is not enough.

The Legislature has occasionally provided that the "owners" of property who are entitled to certain notices may be identified from the "equalized assessment roll." (See, e.g., Gov. Code, §§ 35311, 53521, 58108, 65905.) Each of those provisions reflects a legislative determination that the roll is an adequate source for the particular purpose. The determination is explicit and isolated in each instance, it has not been made in section 21092, and its appearance elsewhere has no effect here.

It may be pointed out that strict enforcement of the "direct mailing" method of giving notice of a proposed negative declaration or EIR will not substantially increase the administrative burden to be borne by public agencies electing to use that method. A routine check among the current "updates" in the Santa Clara County Assessor's office would have turned up the names and addresses of the Williamsons in short order. Any risk of a current time lag in such "updates," however brief, may be avoided by resort to the optionally alternative methods of giving notice by publication or posting. The cost of either may be imposed on the applicant involved. (See § 21089.) The shortcomings of either, as a medium for giving actual notice, are matters to be addressed by the Legislature. It having defined a class to whom notice must be given if the "direct mailing" method is employed, there is no plausible justification for identifying members of the class by consulting an obsolete record source.

Section 21168.5 permits a court to reverse a decision by a public agency for "prejudicial abuse of discretion" in the administration of CEQA. It also provides that "[a]buse of discretion is established if the agency has not proceeded in a manner required by law...." The City's noncompliance with section 21092, in giving notice of the proposed negative declaration by the otherwise permissible method of "direct mailing," constituted a failure to proceed in the manner required by law. (Cf. *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d 68 at p. 88.) Appellants' challenge of the proceedings which followed, including the site development permit issued by the City, is therefore valid. This conclusion calls for reversal with directions as ordered below. Having reached it for noncompliance with section 21092, we need not discuss other points raised on the appeal.

The judgment is reversed. The cause is remanded to the trial court with directions to enter a judgment granting the petition for a writ of mandate as prayed. The stay order made herein on May 25, 1978, shall remain in full force and effect until this decision becomes final.

Caldecott, P. J., and Poché, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 3, 1980.