[No. A024754. First Dist., Div. Five. July 25, 1985.]

ENVIRONMENTAL PROTECTION INFORMATION CENTER, INC., et al., Plaintiffs and Appellants, v.
ROSS JOHNSON, as Resources Manager, etc., et al., Defendants and Respondents.

606

**COUNSEL**

Richard Jay Moller, Michael T. Solomon, Sharon E. Duggan and Leonardini & Associates for Plaintiffs and Appellants.

Julie E. McDonald, Douglas B. Allen, Francisca A. Burnett and Burnett, Burnett & Allen as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Charles W. Getz IV and Peter Van Der Naillen, Deputy

Attorneys General, Jared G. Carter and Rawles, Hinkle, Carter, Brigham, Gaustad & Behnke for Defendants and Respondents.

Margaret Mary O'Rourke as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

LOW, P. J.—By petition for writ of mandate, appellants unsuccessfully challenged the approval of a timber harvesting plan by the California Department of Forestry.[1] The harvesting plan authorized the logging of a 75-acre grove of old-growth redwoods, some of which are over a thousand years old. The redwood grove is situated in the Lost Coast wilderness area of Mendocino County near the Sinkyone Wilderness State Park and is alleged to be among the last remaining 4 percent of the original stands of California virgin redwood. The grove includes a Native American archaeological site thought to have been once inhabited by members of the Sinkyone nation. We hold that the provisions of the California Environmental Quality Act (CEQA) (§ 21000 et seq.) apply to the Forest Practice Act and its regulation of the timber harvesting industry. We further hold that since fundamental provisions of both acts were not followed, the timber harvesting plan was not approved in the manner prescribed by law. Accordingly, we reverse the order denying the petition for writ of mandate.

Appellants, petitioners below, are the Environmental Protection Information Center, Inc. (EPIC), a nonprofit California membership organization; the International Indian Treaty Council, a California corporation representing eight Native American nations and concerned for the preservation of Native American heritage; Robert Sutherland and Richard Gienger, Mendocino County residents who use the Sinkyone Wilderness for recreation and biological study; and Fred Downey, a Native American Mendocino County resident who has ancestral and spiritual ties to the Sinkyone Wilderness. Appellants will be collectively referred to as "EPIC."

Respondents are Ross Johnson (Johnson), Resources Manager for the California Department of Forestry (CDF) and the individual who approved the timber harvesting plan as the representative of the Director of CDF; Jerry

---

[1]Approval of the plan was pursuant to the Z'berg-Nejedly Forest Practice Act of 1973 and its implementing regulations. (Pub. Resources Code, § 4511 et seq.; Cal. Admin. Code, tit. 14, § 895 et seq.)

Unless otherwise indicated, all statutory references are to the Public Resources Code.

Partain, CDF's director; CDF itself, along with the State Board of Forestry and the Secretary of the California Resources Agency, as entities responsible for implementing the Forest Practice Act; Georgia-Pacific Corporation (G-P), which acquired the redwood site in 1973; and its wholly owned subsidiary, Rex Timber, Inc. (Rex Timber), which submitted the timber harvesting plan.

By leave of court, the Sierra Club, the Lexington Hills Association and others, have filed amici curiae briefs on behalf of EPIC. The International Woodworkers of America, Local No. 3-469, has filed an amicus curiae brief on behalf of respondents.[2]

I

Respondent Rex Timber owns the several parcels of timberland which surround the grove.[3] Past logging operations of the company have resulted in the redwood grove standing alone as the only wooded area in the vicinity, encircled by harvested parcels. Rex Timber decided to extend its logging operations to include the redwood grove, and filed a proposed timber harvesting plan with the department.

Under the Forest Practice Act (hereafter FPA), a specific logging operation on privately owned timberlands cannot begin without the logger's preparation and submission of a timber harvesting plan (hereafter THP or plan), which must be approved by the Director of CDF, or, as in this case, the director's representative or designee. (§ 4581.) The THP is an information-

[2]This appeal was initially submitted May 1, 1984. We then determined to resolve this appeal in conjunction with two related petitions for writ relief which involved issues that challenged the constitutionality of the Forest Practice Act. (*County of Marin* v. *California Department of Forestry* [A027483]; *Laupheimer* v. *Superior Court* [A028210].) On August 8, 1984, we vacated submission of the EPIC appeal to permit further consideration of EPIC's contentions in conjunction with the related issues pending in the *Laupheimer* and *County of Marin* cases. On September 6, 1984, the Laupheimer petition was denied. Subsequent developments in the trial court concerning the timber harvesting plan in the *County of Marin* case resulted in the dismissal of that matter as moot on May 1, 1985. Consequently, the EPIC appeal was resubmitted on that date.

[3]The parties engage in a semantic debate regarding the appropriate name of the redwood grove. EPIC resolutely refers to the grove as the "Sally Bell Grove," assertedly named in honor of the last living full-blooded member of the Sinkyone nation. Respondents, on the other hand, persistently protest that the name "Sally Bell Grove" exists on no map or official document, and that the official designation of the area of the grove is "Little Jackass Creek." Evidently, respondents believe that the name used by EPIC was conceived in contemplation of this litigation, to add a touch of emotional impact to EPIC's arguments against approval of the harvesting plan. Whatever the source of the designation "Sally Bell Grove" it is more appropriate for this court to refer to the stand of redwoods by its official designation. Although "a rose by any other name would smell as sweet," the term "Little Jackass Creek" has stylistic deficiencies. We refer to the trees as "the grove."

al document designed to serve as an "abbreviated" environmental impact report, setting forth proposed measures to mitigate the logging operation's potential adverse impact on the environment. CDF and public review of the THP prior to approval is intended to ensure that the adverse environmental effects are substantially lessened, particularly by the exploration of feasible less damaging alternatives to the proposed harvesting project.

A THP is an alternative to a complete environmental impact report (EIR). Normally, a project having a potential significant effect on the environment requires the preparation of an EIR under CEQA (§ 21000 et seq.). The process of EIR preparation includes the initial study of the project to determine whether or not it will potentially have a significant effect on the environment; the issuance of a "negative declaration" in lieu of an EIR if the initial study reveals no potential for a significant effect; and the preparation of an EIR if the study concludes to the contrary. The EIR is then subject to a review process, including public hearings, set forth in CEQA and the administrative regulations promulgated for its implementation. (Cal. Admin. Code, tit. 14, §§ 15060-15075, 15080 et seq.; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514].)

Section 21080.5, however, provides that the Secretary of the Resources Agency may certify a regulatory program of a state agency as exempt from the requirement of EIR preparation, if the program requires that a project be preceded by the preparation of a written project plan containing sufficient environmental impact information. To be certifiable, the agency's regulatory program must be governed by rules and regulations (1) which require that no project shall be approved if there are feasible alternatives or mitigation measures available which would substantially lessen any adverse impact on the environment (§ 21080.5, subd. (d)(2)(i)); (2) which include guidelines for the preparation of the project plan and for its evaluation "consistent with the environmental protection purposes of the regulatory program" (§ 21080.5, subd. (d)(2)(ii)); (3) which require the agency to "consult with all public agencies which have jurisdiction, by law, with respect to the proposed activity" (§ 21080.5, subd. (d)(2)(iii)); and (4) which "[r]equire that final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process" (§ 21080.5, subd. (d)(2)(iv)). The project plan itself must include a description of the proposed activity, its alternatives, and mitigation measures to minimize significant adverse environmental impact. The plan must also be available for a reasonable time for

review and comment by other concerned agencies and by the general public. (§ 21080.5, subd. (d)(3)(i), (ii).)

In January of 1976, the Secretary of the Resources Agency reviewed the FPA and its implementing rules, promulgated by the State Board of Forestry. (Cal. Admin. Code, tit. 14, § 895 et seq. [hereafter Rules or Forestry Rules].) Based on this review, the secretary certified the regulation of the timber industry as exempt from EIR preparation under section 21080.5. This certification constitutes a determination that the THP preparation and approval process, as governed by the FPA and its implementing regulations, is a "functional equivalent" to EIR preparation. (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 976-977 [131 Cal.Rptr. 172].)

While a proposed timber harvest is exempt from preparation of a formal environmental impact report, a THP must be prepared. As an "abbreviated" EIR, the THP must contain sufficient information regarding the environmental effect of the logging project to enable the evaluation of the effect of the project on the environment, the feasibility of alternatives to the project, and the measures to minimize any significant adverse impact.

To this end, the FPA requires that the THP contain specific items of information, including a description of silvicultural methods to be used. (§ 4582.) The Forestry Rules provide regulations governing the contents of the plan, choice of logging methods, as well as CDF's process of the THP evaluation. Sections 897 and 898 of the Rules require the author of a proposed THP to conduct a "feasibility analysis" and thereby select "silvicultural systems, operating methods and procedures" which will "avoid or substantially lessen significant adverse effects on the environment from timber harvesting." (Forestry Rules, § 897, subd. (a).) The Rules further provide substantive criteria for the approval of a THP, and provide, inter alia, that plans will not be approved if they fail to reflect a feasibility analysis, or do not otherwise conform to the rules.

Once proposed, the THP is subject to a review and evaluation process which requires that the proposed plan be reviewed by an interdisciplinary review team and be made available for public inspection. The process also provides for public input by way of comment and for consultation with certain public agencies, including the Department of Fish and Game, the appropriate California regional water quality control board, and the pertinent county planning agency. (§§ 4582.6, 21080.5, subd. (d)(3)(ii).) If CDF approves the plan as in conformity with the rules, the department issues a notice of approval which must include a "written response to sig-

nificant environmental points raised during the evaluation process," including those points raised by members of the general public. (Forestry Rules, §§ 1037.7, 1037.8, 1059; *Gallegos* v. *State Bd. of Forestry* (1978) 76 Cal.App.3d 945, 953-954 [142 Cal.Rptr. 86].)

Rex Timber submitted proposed THP No. 1-83-464M to CDF on August 1, 1983. The proposed THP described the silvicultural method to be used, the type of logging systems and equipment, erosion hazard ratings, methods to minimize accelerated erosion caused by logging, and other factors speaking to the impact of the proposed logging on the natural environment.

The THP was reviewed by an interdisciplinary review team, consisting of representatives of CDF, the Department of Fish and Game, and the regional water quality control board. On August 17, 1983, the team made a preliminary determination that the plan was in conformance with the Forestry Rules. Concerned members of the public addressed their comments on the sufficiency of the plan to CDF; the comments included objections to the logging operations on geological or other scientific grounds, including the objections of appellants Sutherland and Gienger who noted the increased hazard of hillside erosion projected from the proposed silvicultural method of clearcutting.[4] Some objectors opposed the cutting of the trees on aesthetic and philosophical grounds; others noted the value of the grove for recreation, including the visual backdrop it provides for hikers and campers using the nearby Sinkyone Wilderness State Park. Some objectors, including appellant International Indian Treaty Council, indicated their concern that the THP did not adequately protect the Native American archaeological site from damage due to logging operations.

Respondent Johnson made the final determination that the plan conformed to the Forestry Rules, and approved the THP as the director's designee on September 2, 1983. On September 20, EPIC received a document entitled "Official Response of the Director of Forestry to Significant Environmental Points Raised During the Timber Harvesting Plan Evaluation Process." This document briefly considered and rejected the various objections advanced by appellants and other members of the public to the approval of Rex Timber's THP.

On September 30, EPIC filed an action in Sonoma County Superior Court attacking CDF approval of the THP. As its first cause of action, EPIC's complaint sought a writ of mandate to set aside the approval decision. The

---

[4]"Clearcutting" is a silvicultural method involving the removal of an entire stand of trees in one cut. (Forestry Rules, § 913.1, subd. (a).)

second and third causes of action sought declaratory and injunctive relief. The fourth cause of action sought a preliminary injunction against Rex Timber and G-P, restraining them from cutting down any trees or otherwise conducting logging operations under the plan pending the disposition of the lawsuit.

Following a change of venue to Mendocino County, Rex Timber and G-P were temporarily restrained from conducting logging operations pending the outcome of the proceeding. After hearing, the superior court determined that the application for injunctive relief would be denied on the mandamus petition, and proceeded to determine whether or not the petition should be granted. EPIC argued that CDF's decision to approve the plan was not supported by substantial evidence, and that CDF had approved the plan without proceeding as required by law. After hearing argument but refusing to consider proffered evidence outside of the administrative record, the superior court denied the petition and the application for injunctive relief, and extended its temporary restraining order (TRO) to enable EPIC to seek a stay of the logging operations from this court. We issued a stay order restraining Rex Timber and G-P from conducting any logging operations on the grove pending our resolution of this appeal.[5]

## II

### A

EPIC argues that the superior court erred by restricting itself to the record before the administrative agency (CDF), and that the court refused to consider additional evidence outside the record, proffered by EPIC to show (a) that the decision that the proposed THP was in conformity with the FPA and Rules was not based on substantial evidence; and (b) that CDF failed to proceed as required by law in that it did not follow all appropriate procedures in its evaluation and approval process. EPIC also argues that notwithstanding this allegedly erroneous evidentiary limitation, the administra-

---

[5]Respondents Rex Timber and G-P contend that EPIC's appeal violates the one-judgment rule, which provides that a judgment adjudicating less than all causes of action is not appealable. (*Lostritto* v. *Southern Pac. Transportation Co.* (1977) 73 Cal.App.3d 737, 750 [140 Cal.Rptr. 905]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 36, p. 4050.) The argument is that the order denying the petition for writ of mandate and the dependent application for preliminary injunction does not dispose of the second and third causes of action to which respondents demurred. EPIC voluntarily dismissed with prejudice its second and third causes of action after the filing of its notice of appeal. Under the circumstances, the accepted procedure is for the appellate court to consider the appeal as from a final judgment. (See *Lostritto* v. *Southern Pac. Transportation Co., supra,* at p. 750; cf. *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 207-208, fn. 5 [197 Cal.Rptr. 783, 673 P.2d 660].)

tive record itself shows that CDF did not adequately follow all procedures required by law. This contention focuses on the sufficiency of CDF's written responses to the public's significant environmental objections to the proposed logging operation and the contents of the THP; CDF's failure to timely issue those responses; CDF's failure to consult with all necessary agencies having jurisdiction over matters affected by the plan; and CDF's failure to consider the cumulative effects of logging both on the site of the grove and in surrounding areas. EPIC argues that these procedural derelictions constitute a "prejudicial abuse of discretion" within the meaning of section 21168.5, and require the setting aside of the THP by writ of mandate.[6]

██ The parties agree that the standard of judicial review of a CDF decision to approve a THP is the same as that used to review an agency decision involving an EIR: the limited inquiry into whether the decision was a prejudicial abuse of discretion. (§§ 21168, 21168.5; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 83.) An abuse of discretion may be shown only if CDF's decision is not based on substantial evidence, or if CDF did not proceed in the manner required by law in approving the plan. (*Ibid.*)

B

Do the provisions of CEQA apply to the FPA and the Forestry Rules, and thus govern the regulation of the timber harvesting industry of this state? EPIC contends that the provisions of CEQA apply to timber harvesting operations and the process of THP evaluation. Respondents maintain that only the FPA and the Rules apply and dispute every contention of EPIC that the provisions of CEQA apply to the subject matter of this appeal.[7] ██ We agree with EPIC that the provisions of CEQA apply to the regulation of the timber harvesting industry under the FPA and the Rules.

Two Court of Appeal decisions hold CEQA applicable to the regulation of the timber harvesting industry. (*Gallegos* v. *State Bd. of Forestry, supra,*

---

[6]Consistent with the sound approach adopted by the trial court, we focus on the merits of EPIC's petition for writ of mandate. The merits of the application for preliminary injunction necessarily hinge upon the merits of the petition for mandamus.

For purposes of stylistic convenience, we refer to respondents in the plural even when discussing an argument made or position taken by one respondent, or by only one of the two respondents' briefs.

[7]Although EPIC explicitly argues that CEQA applies, and so argued below, respondents address this issue for the most part by implication.

76 Cal.App.3d 945; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d 959.)

In *Natural Resources,* Division Two of this court discussed the relationship between CEQA and FPA, and rejected arguments by the timber companies that CEQA was not applicable to regulation of harvesting operations. The court rejected an argument that the FPA applies to the THP to the exclusion of CEQA, because FPA is a specific statutory scheme, while CEQA is a general one. "One should seek to consider the statutes not as antagonistic laws but as parts of the whole system which must be harmonized and effect given to every section [citations]. Accordingly, statutes which are in *pari materia* should be read together and harmonized if possible. Even when one statute merely deals generally with a particular subject while the other legislates specially upon the same subject with greater detail and particularity, the two should be reconciled and construed so as to uphold both of them if it is reasonably possible to do so [citations]." (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d at p. 965.) The court concluded that CEQA and the FPA "are not in conflict, but rather supplement each other and, therefore, must be harmonized." (*Ibid.*) CEQA's provisions are deemed a part of the FPA, along with the administrative guidelines adopted for CEQA's implementation (Cal. Admin. Code, tit. 14, § 15000 et seq. [hereafter CEQA Guidelines or Guidelines]).

In rejecting another argument against the applicability of CEQA, the court cited a crucial distinction between the two acts which seems equally applicable in this context. The distinction stems from the fundamental differences in the purposes and goals of the two statutory schemes. CEQA demonstrates a legislative intent to maintain "a quality environment for the people of this state" (§ 21000, subd. (a)), and to ensure that all state agencies which regulate private conduct "found to affect the quality of the environment" shall regulate such conduct "so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." (§ 21000, subd. (g); see § 21001.) CEQA is "perceived as a logical and carefully devised program of wide application and broad public purpose . . . ." (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d at p. 966; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) The act is to be interpreted broadly in order to afford the fullest protection to the environment consistent with the reasonable scope of the statutory language. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 83; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

In contrast, the FPA is not intended as a general set of guidelines for statewide environmental protection. More importantly, the protection of the environment is not the sole purpose of the statute. The purpose clause of the FPA mentions environmental concerns as a secondary consideration. The primary goal of the statute seems to be the "maximum sustained production of high-quality timber products," achieved "while giving consideration" to environmental concerns and values. (§ 4513; see § 4512.) Although the FPA recognizes the need to conduct timber harvesting operations consistent with environmental concerns, it is a specific statute not only regulating but fostering timber harvesting despite the industry's recognized potential for adverse environmental effects. (*Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 6-8, 11 [97 Cal.Rptr. 431].)

CEQA, as the general polestar of environmental protection, can be readily harmonized with the FPA and is applicable to timber harvesting operations and the approval of THPs. This same conclusion was reached in *Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d 945, wherein Division Four of this court held CEQA applicable to timber harvesting operations. The *Gallegos* court took from CEQA cases the standard of sufficiency of responses to public objections to a proposed project, and applied that standard to the responses of the Director of Forestry to objections made to a THP during the evaluation process. (*Id.,* at pp. 952-954.)

██ Section 21080.5 does not grant the timber harvesting industry a blanket exemption to CEQA's provisions; it grants only a limited exemption to the applicability from CEQA by allowing a timber harvester to prepare a THP in lieu of a complete environmental impact report. In *Natural Resources,* the court discussed the history of the interrelationship of CEQA and the FPA prior to the enactment of section 21080.5. Before 1976, the FPA was provided a blanket exemption from CEQA in explicit terms; the exemption expired on January 1, 1976. Meanwhile, the Legislature in 1975 rejected at least four bills which would have accorded a permanent blanket exemption of the timber harvesting industry from the provisions of CEQA. (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d at p. 973.) The court discussed the newly enacted section 21080.5 and concluded that far from being a blanket exemption to the scheme of CEQA, the section allowed for a limited exemption to the extent that a project plan required the filing of only an abbreviated EIR. (*Id.,* at pp. 976-977.)

The *Gallegos* court's analysis of the issues raised in that case is in complete harmony with the "limited exemption" approach. Other authorities are in accord. Our Supreme Court has discussed section 21080.5 in terms

of its providing "an alternative to the EIR requirement" of CEQA. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537].) The CEQA Guidelines themselves provide that: "A certified program [under section 21080.5] remains subject to other provisions in CEQA such as the policy of avoiding significant adverse effects on the environment where feasible." (Guidelines, § 15250.) These Guidelines were promulgated by the administrative agency charged with the implementation of CEQA; an implementing agency's official interpretation of a statute is entitled to considerable weight. (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640 [335 P.2d 672].) The Secretary of the Resources Agency, when certifying the FPA and Rules as "functionally equivalent" under section 21080.5, confirmed "that the regulation of timber operations on private lands in California by the California Division of Forestry and the Board of Forestry meets the criteria contained in . . . section 21080.5 and accordingly *is exempt from the requirement for preparing environmental impact reports under Chapter 3 (commencing with Section 21100 of Division 13 of the Public Resources Code)*." (Italics added.) The secretary did not use language exempting the regulation from the entire CEQA (div. 13 in its entirety, commencing with § 21000), but only to chapter 3 of CEQA, which specifically involves EIR requirements and procedures.

Furthermore, section 21080.5, by its own terms, specifically exempts "functionally equivalent" regulatory programs from two chapters and one additional section of CEQA: chapter 3 (§ 21100 et seq.), chapter 4 (§ 21150 et seq.), and section 21167. Under the maxim *expressio unius est exclusio alterius,* exemptions specified in the statute prevent additional exemptions from being implied or presumed, absent a clear legislative intent to the contrary. (*Wildlife Alive* v. *Chickering, supra,* 18 Cal.3d at p. 195; *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 461 [343 P.2d 8].) ■ An examination of the specific exemptions in the statutory scheme of CEQA reveals no legislative intent contradicting that maxim, and if anything strengthens the maxim's applicability and the conclusion that save for the exempted provisions, CEQA applies to the FPA and Forestry Rules.

Chapter 3 of CEQA requires the preparation of an EIR for projects of potentially significant environmental effect which are to be carried out or approved by state agencies, boards or commissions; chapter 4 deals similarly with projects to be carried out or approved by local agencies. Section 21167 governs the time limitations on judicial proceedings to review or set aside agency decisions specifically involving the various steps of the EIR process, including the initial decision regarding potential adverse impact.

Chapters 3 and 4 are in large part procedural elements of the EIR process. A certified program under section 21080.5 is logically exempted from their

coverage as such programs provide an alternative to an EIR. Section 21167 is specifically geared to the machinery of the EIR process, and the application of any of its provisions to the THP approval process would be superfluous: Section 21080.5 contains its own time limitation for judicial action challenging a decision made under a functionally equivalent regulatory program. The logic of exempting these sections from the process declared to be an acceptable alternative to EIR preparation is apparent. By making these specific exemptions, the Legislature has manifested an intent to retain the applicability of the other provision of CEQA and of the Guidelines, particularly the substantive criteria and the specific aspects of environmental effect that must be evaluated before a project may proceed. Nothing in section 21080.5 supplies a basis for concluding that the Legislature intended the section to stand as a blanket exemption from CEQA's thorough statutory scheme and its salutary substantive goals.

■ Respondents argue, however, that the Legislature has evidenced its contrary intent that CEQA not apply to the timber harvesting industry by its enactment of section 4582.75 of the FPA. This section reads: "The rules adopted by the board [i.e., the Forestry Rules] shall be the only criteria employed by the director when reviewing timber harvesting plans pursuant to Section 4582.7." Section 4582.75 was enacted by the 1977 Legislature, the year after *Natural Resources* was decided; respondents contend that the section is a legislative riposte to the thrust of *Natural Resources'* holding that CEQA applies to the FPA; stressing the section's use of the word "only," respondents argue that section 4582.75 purports to limit the evaluative criteria of THPs to the Forestry Rules. Respondents' position does not withstand analysis. The section's legislative history dispels any inference that the statute manifests a legislative intent to exempt the FPA from the provisions of CEQA, nullifying *Natural Resources*.

Section 4582.75 was added to the Public Resources Code (Stats. 1977, ch. 930, § 3, p. 2844) along with section 4555 (Stats. 1977, ch. 930, § 2, pp. 2843-2844) and an amendment to section 4552 (Stats. 1977, ch. 930, § 1, p. 2843). Prior to the 1977 amendment, section 4552 provided that "[t]he rules and regulations adopted by the board shall be based upon a study of the factors that significantly affect the present and future condition of timberlands and shall be used as standards by persons preparing timber harvesting plans." The amendment added the sentence, "In those instances in which the board intends the director to exercise professional judgment in applying any rule, regulation, or provision of this chapter, the board shall include in its rules standards to guide the actions of the director, and the director shall conform to such standards, consistent with Section 710 [which prohibited the director from amending or repealing any regulation or direc-

tive of the board]." Section 4555 provided that if the director "determines that a substantial question concerning the intent of this chapter is not currently provided for by the rules and regulations of the board," and a proposed THP involving that question would, if approved, result in "immediate, significant and long-term harm" to the environment, the director could withhold approval of the plan pending a public hearing of the board addressing and resolving the question. Section 4582.75 then provided that the rules would be the sole criteria employed by the director in reviewing THPs.

These statutory changes do not bear the stamp of disapproval of the *Natural Resources* decision or its interpretation of the relationship of CEQA and the FPA. Rather, the changes bear the hallmarks of modifications of internal relationships and operating procedures between the director and the board, and speak primarily to the perceived evil of the director's exercise of unbridled judgment. The legislative digest of the bill (Sen. Bill No. 886) describes the bill as "[requiring] the board to include in its rules standards to guide the actions of the Director of Forestry where it intends the director to exercise professional judgment in applying any rule, regulation, or provision of the act. The bill would require the director to conform to such standards, and would specify that the rules adopted by the board shall be the only criteria employed by the director . . . ." (Legis. Counsel's Dig. of Sen. Bill No. 886, Stats. 1977 (1977-1978 Reg. Sess.) Summary Dig., p. 241.)

We construe section 4582.75 as a measure to prevent the exercise of the director's discretion outside of the Rules, but not as a manifest intent to completely exempt the timber harvest industry from CEQA. Had the Legislature intended to declare this state's major environmental quality legislation inapplicable to the statutes and regulations governing the timber industry, it certainly could have done so in a more positive fashion. It has made such an explicit exemption in the past. The *Natural Resources* opinion noted that the timber industry was granted a temporary exemption from CEQA as an emergency measure, enacted as section 4514.3 and expiring of its own terms on January 1, 1976. Former section 4514.3 explicitly provided that "[a]ll actions taken pursuant to this chapter [the FPA] are exempt from the provisions of Division 13 (commencing with Section 21000)" of the Public Resources Code, which is a citation to CEQA in toto. (Stats. 1975, ch. 174, § 1, p. 327.) Had the Legislature chosen to do what respondents claim it has done, one would have expected to have seen similar language in section 21080.5 or perhaps in section 4582.75; the language is conspicuously absent. Section 4514.3, subdivision (d) provided that the "provisions of Division 13 (commencing with Section 21000)," in other words, CEQA in its entirety, "do not apply to the preparation, review, or

approval of timber harvesting plans . . . *until January 1, 1976.*" (Italics added.) This statutory language itself lapsed when section 4514.3 expired of its own terms, but provides even further evidence that the Legislature intends CEQA to apply to the regulation of the timber harvesting industry, particularly the evaluation and approval of THPs.[8]

■ We therefore hold, consistent with *Natural Resources, Gallegos,* Guidelines section 15250 and established rules of statutory construction, that except for the specific exemptions discussed, CEQA and its substantive criteria for the evaluation of a proposed project's environmental impact apply to the timber harvesting industry, and are deemed part of the FPA and the Forestry Rules. While section 21080.5 may allow the industry to prepare abbreviated project plans instead of full-blown EIRs, it does not except the industry from adhering to the broad policy goals of CEQA as stated in section 21000, and to CEQA's substantive standards designed to fulfill the act's goal of long-term preservation of a high quality environment for the citizens of California. (§§ 21000, 21001.)

III

EPIC argues that the superior court erred by limiting the scope of its review to the administrative record. EPIC also argues that even without the additional evidence outside the record, the administrative record itself reveals that CDF did not proceed in a manner required by law, by failing to adhere to key procedural requirements in evaluating and approving the THP. Since CEQA and the Guidelines apply to the FPA and the Forestry Rules as discussed above, we conclude that the contentions based on the

---

[8]Respondents also claim that since section 4582.75 was enacted *after* the *Natural Resources* decision, this illustrates a legislative intent to overrule the case. After both *Natural Resources* and *Gallegos* were decided, the Legislature made comprehensive amendments to the FPA, made no mention of the applicability of CEQA to the FPA, and took no action to "correct" the "erroneous" interpretation application of CEQA to the timber industry, embodied in the 1978 holding of *Gallegos.* (Stats. 1984, ch. 636; Stats. 1984, ch. 738; Stats. 1984, ch. 1297; Stats. 1984, ch. 1446; Stats. 1984, ch. 1508.) Moreover, the Legislature added section 21080 to CEQA in 1983, listing 18 types of projects to which CEQA was declared inapplicable. Among these projects are "[p]rojects undertaken *by a local agency* to implement a rule or regulation imposed by a state agency, board, or commission under a certified regulatory program pursuant to Section 21080.5." (§ 21080, subd. (b)(16).) Whatever the purpose of this subdivision, it applies to a limited aspect of a section 21080.5 program (local projects *designed to implement a state regulation*), not section 21080.5 projects in general, such as timber harvests, development, or any other project with a potential adverse environmental effect; the specific wording of the section is not indicative of any intent of the Legislature to remove section 21080.5 projects in general from the impact of CEQA, save for those sections exempted by section 21080.5 itself.

administrative record are alone sufficient to show a prejudicial abuse of discretion and are dispositive of this appeal.[9]

### A

Sections 4582.6 and 21080.5 require that a proposed THP be made available for public inspection, and require that the public be provided input into the evaluation process by raising significant environmental objections. Forestry Rules section 1037.7 requires the Director of CDF or the appropriate designee to issue a written response to significant environmental objections ("response") as part of the notice of approval of the plan. Rules section 1037.8 requires that the notice of approval, which must include the response, shall be issued no later than 10 days from the date of approval. A lawsuit to challenge the decision to approve a THP must be filed within 30 days of the date of notice of approval (§ 21080.5, subd. (g)), or within 30 days of the date the director's response is due.

EPIC asserts that it did not receive the response until September 20, 1983, 10 days and only 8 working days before the expiration of the 30 days within which to prepare and file a legal challenge to the approval decision. Respondents concede that Johnson's written response to the environmental objections was not made within the 10-day period, but argue that the failure to comply with the time period did not prejudice EPIC. Respondents point to the fact that notwithstanding the tardiness of the response, EPIC was able to file its suit within the 30-day deadline. Respondents also note that EPIC had sufficient time to obtain a restraining order against logging under the plan, and that any argument that EPIC was prejudiced by having to prepare its complaint in undue haste is dispelled by EPIC's obtaining leave to file an amended complaint, which was presumably prepared under less-pressured circumstances. The superior court agreed with respondents and concluded that EPIC was not prejudiced in its challenge to the THP approval.

Since respondents admit that CDF failed to proceed as required by law when it violated the Rule section, this court could find that violation an

---

[9]At the hearing on the petition for writ of mandate, respondent Johnson testified that all proper procedures were followed. His testimony has been characterized as beyond the administrative record, see footnote 18, *infra,* but also as merely summarizing that record by describing the procedures followed by CDF in approving the THP. Respondents rely on Johnson's testimony and declarations to refute EPIC's procedural challenges. Johnson did testify in a conclusory fashion that all applicable procedures were followed. His testimony reveals, however, that his definition of "applicable procedures" did not include CEQA and the Guidelines, but was limited to the FPA and Rules. Johnson's testimony thus does not conflict with our conclusion that certain requisite procedures were not followed.

abuse of discretion. ■ It remains to determine whether the abuse of discretion is prejudicial, and should have been so found by the trial court.[10]

Rules section 1037.8 provides that the response "shall" be given within 10 days, making the section a mandatory administrative regulation. (*Plaggmier* v. *City of San Jose* (1980) 101 Cal.App.3d 842, 852 [161 Cal.Rptr. 886].) EPIC argues that it need not demonstrate actual prejudice because the failure to adhere to a mandatory administrative regulation in the context of environmental law can itself be deemed a prejudicial abuse of discretion. A number of cases involving judicial review of administrative decisions involving EIRs and THPs have consistently regarded violations of mandatory CEQA regulations as prejudicial, without discussion of the question of whether prejudice is presumed. Indeed, the thread flowing through the cases seems to be the principle that failure to follow at least significant, mandatory CEQA regulations is by its nature prejudicial.

In *Gallegos* and in *Society for California Archaeology* v. *County of Butte* (1977) 65 Cal.App.3d 832, 839-840 [135 Cal.Rptr. 679], the reviewing courts found violation of the requirement of providing sufficient responses to the public's objections to be prejudicial, without discussion. In *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, our Supreme Court found a violation of a basic CEQA provision to be a prejudicial failure to proceed as required by law, with virtually no discussion. Finally, in *Plaggmier,* the court, while not phrasing its discussion in terms of prejudice, found substantial rather than complete compliance with CEQA-mandated notice procedures to be an abuse of discretion requiring vacating of the administrative decision.

Full compliance with the letter of CEQA is essential to the maintenance of its important public purpose. (*Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 357 [173 Cal.Rptr. 390].) Reviewing courts "have a duty to consider the legal sufficiency of the steps taken by [administrative] agencies [citation], and we must be satisfied that these agencies have fully com-

---

[10]Respondents argue that a violation of the 10-day rule would not as a matter of law invalidate a timber harvest plan because the violation occurs after the plan is approved. Respondents contend that such a violation would, at most, estop CDF from pleading violation of the 30-day statute of limitations under section 21080.5, subdivision (g), if a legal challenge to an approved plan was filed after the 30 days have run. We decline to take this narrow, mechanistic view of the approval process. The public's input into the plan approval process is mandated by law and supported by strong public policy. The written response is a keystone to the public's participation in the approval process, and an important element in the public's right to prepare and file a challenge within the maximum time allowed under the rules. Since an approved plan is not final and may be set aside by judicial decree, the 10-day rule is part and parcel of the process of plan approval.

plied with the procedural requirements of CEQA, since only in this way can the important public purposes of CEQA be protected from subversion." (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 71-72 [198 Cal.Rptr. 634].) At least, when these provisions go to the heart of the protective measures imposed by the statute, failure to obey them is generally "prejudicial"; to rule otherwise would be to undermine the policy in favor of the statute's strict enforcement.[11]

No less stringent standard should apply to the CEQA-governed THP process. The legislative emphasis on public participation in the THP evaluation process has already been noted. The public's interest in the forest resources and timberlands of this state has been described as "fundamental." (*Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d at p. 950; *Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 155 [129 Cal.Rptr. 743].)

The 10-day rule is a key regulation preserving the public's right to challenge a plan approval without the undue haste caused by CDF's violation of the rule. For this reason the 10-day time limit must be enforced, without after-the-fact speculations on ephemeral possibilities of prejudice or the lack thereof. The public has the right to bring a legal action to challenge a decision to approve a THP, and must do so within a limited time. One-third of that time must be spent awaiting the director's response to the significant environmental objections raised during the evaluation process. This response will obviously be of crucial assistance in the evaluation of any potential lawsuit, and in the structuring of arguments, pleading allegations and prayers for relief. The sufficiency of the responses may itself be a ground on which to challenge the decision of approval. (*Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d 945.) The strong legislative policy set forth in CEQA requires that the public's right to vindicate its interest by bringing a legal action, such as the one in this case, must be stringently protected by strict compliance with the Rules. The public must be assured that it will

---

[11]In 1984, the Legislature enacted section 21005, which provides that courts reviewing CEQA decisions "shall continue to follow the established principle that there is no presumption that error is prejudicial." Judicial decisions indicate that the "established principle" in CEQA cases was not one of presumed prejudice from any error, but one involving the determination of prejudice from the violation of a fundamental regulatory provision. Absent additional guidance from the Legislature, and in light of the policy expressed in the cases discussed, we assume that the enactment of section 21005 was simply a reminder of the general rule that errors which are insubstantial or de minimis are not prejudicial. There is no inconsistency between this interpretation and the principle that prejudice generally flows from the violation of a significant CEQA regulation, given the fundamental right of the public to a protected environment and the policies underlying CEQA.

have its full period within which to conduct the time-consuming task of preparing a lawsuit.

Realistically, it is difficult to fully gauge whether prejudice exists or not: Who can say whether a given suit might be more likely to succeed if its progenitors are given their full time period in which to prepare? Who can say whether other members of the public, or other public interest groups, perhaps with more funds or other resources than the actual eventual plaintiffs, may have decided not to become involved because of a lack of time? Faced with the ease of compliance with the time regulation, and the policies of CEQA, reviewing courts should not engage in this kind of speculation. The 10-day time period is a duty imposed by the regulations and must be strictly followed. The failure to proceed in the manner required by law by following the regulation is a prejudicial abuse of discretion.[12]

B

■ EPIC argues that the administrative record shows that CDF and the author of Rex Timber's THP did not consider the cumulative impact of past logging activities, combined with the proposed harvest, on the ecology of the grove. The grove stands as the last substantially forested area in the vicinity, due to Rex Timber's past logging operations on surrounding sites. EPIC maintains that cumulative impact is especially important in this case because the trees of the grove, many of which are located on steep slopes with medium to high erosion hazard ratings, are providing the major root system "keystone" holding some hillsides intact. EPIC also argues that in light of the surrounding clearcut parcels, the cumulative effect of clearcutting the last remaining stand of trees must also be considered from an aesthetic and recreational point of view.

In its response to a public objection based on the failure to consider cumulative impact, CDF took the position that it does not have to consider cumulative impact in the evaluation of a THP. CDF cited section 4582.75 as limiting CDF's criteria to the Rules, and noting that "no specific rules have been adopted" regarding cumulative logging. CDF then stated that timber operations in general had to substantially lessen significant adverse impacts on the environment, and closed with this comment: "To address the cumulative effect issue the Department has taken the tact [sic] that if the adverse effects are minimized to the maximum on each individual operation,

---

[12]We need not address the question of actual prejudice. EPIC asserts that such prejudice exists because it did not have sufficient time within which to file a TRO before Rex Timber began logging, resulting in the cutting down of some trees on the grove. EPIC also asserts that it was placed under extreme time pressures because of the rule violation.

then the total effect in the surrounding area will also be minimized to an acceptable level."

This statement is at odds with the concept of cumulative effect, which assesses cumulative damage as a whole greater than the sum of its parts. The Guidelines define "cumulative effect" as "two or more individual effects which, *when considered together,* are considerable *or which compound or increase other environmental impacts.*" (Guidelines, § 15355, italics added.) Such impacts may be of past, present or future existence. (*Ibid.*)

Respondents have consistently taken that position in this court, arguing—as did the CDF response to the objection—that the consideration of the cumulative impact of a proposed timber harvest is not required under the FPA or Forestry Rules. CEQA, however, requires that cumulative impact be considered as a substantive criterion for the evaluation of the environmental impact of a proposed project. (§ 21083, subd. (b); Guidelines, § 15130.) Since CEQA applies to the THP evaluation and approval process, it follows that CDF did not proceed in the manner required by law by failing to consider the impact of cumulative effects, or by considering such effects under the erroneous conception of cumulative impact recited by CDF and quoted above.[13] The failure to consider cumulative impact was a prejudicial abuse of discretion.

## C

■ EPIC contends that CDF had a legal duty to consult with the Native American Heritage Commission, which has special expertise on the subject of Native American historical sites. The commission has jurisdiction to identify sites of special religious and spiritual significance to Native Amer-

---

[13]Respondents contend that the issue of cumulative impact is not properly before us, claiming that the issue is not alleged in EPIC's petition as a ground for setting aside the THP. The petition does not use the phrase "cumulative impact," but does allege a prejudicial abuse of discretion for failure to consider the effects of past logging in the area. We consider this allegation sufficient. Moreover, we are empowered to consider for the first time on appeal the legal question of whether CDF had to consider cumulative impact, particularly since that question involves the significant public interest of environmental protection. (See *Bayside Timber Co.* v. *Board of Supervisors, supra,* 20 Cal.App.3d at pp. 4-5.)

Respondents Rex Timber and G-P argue in the alternative that CDF did in fact consider cumulative impact. They point to two pages of Johnson's testimony concerning postharvest inspection requirements, and a two-page excerpt from a report of a 1979 field trip to the general area. Respondents claim these matters demonstrate that cumulative impact was considered. We disagree: the evidence shows only that surrounding logged sites were visited in 1979, and have been revisited for purposes of postharvest stocking, not for the consideration of the logging's cumulative effect on the redwood grove involved in this case. The evidence is insufficient to establish that cumulative impact was considered, particularly in the face of the contrary position taken by CDF in its response to the public's objection.

icans and their heritage, to make recommendations regarding sacred places located on private lands, and to consider the environmental impact on property identified or reasonably identified as a place of special religious significance to Native Americans. (§§ 5097.94, 5097.95.) Although respondents address this issue only briefly, they argue, as they did below, that the only agencies they were required to consult are those designated in section 4582.6 of the FPA: the Department of Fish and Game, the appropriate regional water quality control board, and the county planning agency.[14] They also argue that under Forestry Rules section 898.1, subdivision (b), the director only has to consult with affected agencies if he or she is "in doubt as to the feasible alternative which best carries out the intent of the Act."

Respondents' reliance on the FPA and Rules alone is of no avail in light of the applicability of CEQA to timber harvest regulations. CEQA provides that agencies evaluating a project for its environmental impact consult with all agencies having jurisdiction over affected natural resources, including archaeological sites. (§ 21080.4; Guidelines, § 15086.) The commission has that jurisdiction, and is specifically listed in appendix B to the Guidelines as a public agency with specific expertise regarding places of religious significance to Native Americans, including archaeological sites and burial grounds. Other provisions of CEQA reflect a strong legislative policy choice in favor of the preservation of Native American archaeological sites, cemeteries, and other sacred grounds. (§ 21083.2; Guidelines, appen. K.)[15] The presence of the archaeological site on the site of the proposed timber harvesting mandated CDF consultation with at least the Native American Heritage Commission. This conclusion is consistent not only with the literal terms of CEQA and its guidelines, but with the acknowledged policy of interpreting CEQA's scope as broadly as possible to accomplish the ends of the act, using the widest definition of "natural resources" (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259). The term "environment" as used in the act has been held to encompass "objects of historic or aesthetic significance" (§ 21060.5), including archaeological sites. (§ 5097.9; *Society for California Archaeology* v. *County of Butte, supra,* 65 Cal.App.3d at p. 837.)

---

[14]EPIC argues that the administrative record fails to show that CDF consulted with other agencies, including the agencies listed in section 4582.6. The record adequately establishes that CDF did consult with these agencies.

[15]For a discussion of CEQA's policy of preservation of the archaeological sites of California Native Americans, see Comment, *Preserving Indian Archaeological Sites Through The California Environmental Quality Act* (1975) 6 Golden Gate L.Rev. 1. The author notes that the culture of California Native Americans is a significant part of California cultural history, and can only be studied through archaeology.

The Legislature has determined that the invaluable remnants of the vanished culture of the California Native Americans be protected as much as is feasible. Among these protective measures is the requirement of consultation with the Native American Heritage Commission before approval of any THP for a site bearing an archaeological site. CDF's failure to consult with the commission constitutes an abuse of discretion for failing to proceed in the manner required by law; that abuse of discretion is prejudicial.

### D

During the evaluation process, members of the public raised an objection to the proposed THP, addressing the sufficiency of the measures to mitigate damage to the Native American archaeological site located in the grove. EPIC contends on appeal that the director's response to the objection is insufficient. ■ The insufficiency of the Director of Forestry's responses to environmental objections may be grounds for the issuance of a writ of mandate to set aside a decision approving a timber harvesting plan. (*Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d at pp. 952-955.)

The public's objection was prompted by dissatisfaction with this description of the efforts to mitigate damage to the site, taken from the THP itself: "The site has been investigated by qualified archaeologists, and a report is being prepared. Logs will be removed by keeping tractors out of the site as flagged on the ground, but an existing skid trail will be used for tractors." The second sentence is itself alleged to be ambiguous and is the subject of another contention on appeal as to its exact meaning, including whether it actually bans the dragging of felled logs across the site.

EPIC was unable to obtain a copy of the archaeologist's draft report during the evaluation process, and was unable to assess the mitigation efforts of Rex Timber, or the precise vulnerability of the site to logging operations. CDF's response to EPIC's objection is as follows: "The archaeological site has been addressed. A private archaeologist was hired by Georgia-Pacific. The site has been excavated and a report is forthcoming. The Department of Forestry's archaeologist has reviewed a draft of the report and has visited the site and concurs with the protection measures imposed by Georgia-Pacific." Evidently, neither the draft report reviewed by the CDF archaeologist nor the final report was ever released to EPIC or, evidently, to any member of the public.[16]

---

[16]CDF asserts that the record shows EPIC, or at least one individual appellant, did eventually receive a copy of the report. The accompanying citation to a portion of the reporter's transcript does not bear out this assertion. The record indicates that EPIC never received a

*Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d 945, set forth the controlling standard for the sufficiency of the required written responses to significant environmental objections. Adapting the analogous criteria governing responses to objections to a proposed project requiring an EIR, the *Gallegos* court ruled that the responding agency (in that case, the State Board of Forestry) "need not respond to every comment raised in the course of the review and consultation process, but [the agency] must specifically respond to the most significant environmental questions raised in opposition to the project." (*Id.,* at p. 954; see *People* v. *County of Kern* (1974) 39 Cal.App.3d 830 [115 Cal.Rptr. 67].) Such responses must include a description of the issue raised "and must particularly set forth in detail the reasons why the particular comments and objections were rejected and why the [agency] considered the development of the project to be of overriding importance." (*Id.,* at p. 841.)

The purpose of this requirement is to provide the public with a good faith, reasoned analysis why a specific comment or objection was not accepted. ■ For this reason, conclusory responses unsupported by empirical information, scientific authorities or explanatory information have been held insufficient to satisfy the requirement of a meaningful, reasoned response: conclusory responses fail to crystallize issues, and afford no basis for a comparison of the problems caused by the project and the difficulties involved in the alternatives. (*Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 411 [151 Cal.Rptr. 866], quoting *People* v. *County of Kern, supra,* 39 Cal.App.3d at pp. 841-842; *Gallegos* v. *State Bd. of Forestry, supra,* 76 Cal.App.3d at p. 954; *Society for California Archaeology* v. *County of Butte, supra,* 65 Cal.App.3d at pp. 839-840.)

CDF's response was inadequate. The response contains no analysis of the issue of the protection of the archaeological site. It contains no specific information to communicate the basis for the rejection of the objection. It refers to a draft report relied upon by unknown archaeologists, one hired by the logging company and the other employed by the very agency whose actions have been questioned. It refers to a final report as "forthcoming"; EPIC's efforts to obtain a copy of the report were unsuccessful, mostly due to the logger's refusal to release the report on the ground that it was a "private" document. Reference to a report of unknown content, which the CDF refuses to divulge, cannot constitute a sufficient answer to an environ-

---

copy of either the draft report, relied on during the evaluation process, or the final report which was later completed.

Rex Timber has argued that the issue concerning the archaeological report is framed differently on appeal than it was below. We conclude that the issue was argued below essentially as it is now framed.

mental objection under the *Gallegos* test. Indeed, CDF's response seems to hide behind vague officialese while relying on the contents of essentially classified documents.

The response to the significant issue of protection of the Sinkyone archaeological site is inadequate under the *Gallegos* standard. By failing to provide an adequate response to the public objection, to enable the objectors to intelligently assess the impact of the THP on the archaeological site, CDF failed to proceed in the manner required by law.

The nondisclosure of the archaeologist's report is itself characterized by EPIC as yet another instance of CDF's failure to abide by mandatory procedures. EPIC argues that public disclosure of the report was mandated by section 21080.5, which requires a project plan "or other written documentation required by the regulatory program" be available for public inspection. Although there is no FPA or CEQA provision requiring the preparation of an archaeological report, EPIC in effect contends that since CDF had a statutory duty to mitigate damage to the site as a "unique" natural resource (§ 4582, subd. (f); Rules, § 898, subds. (a)(2), (a)(3)), it had a duty to embody the mitigation measures in a written report.

CEQA does provide for the evaluation of a proposed project's effect on archaeological resources and provides for mitigation of the damage to be caused thereby. Neither statute explicitly requires the preparation of a written report. As such, public disclosure of the report was not required by section 21080.5.

This does not end the inquiry. A THP must be disclosed to the public, along with any documents which it incorporates by reference (§§ 4582.6, 21080.5, subd. (d)(3)(ii)). Although the report was not explicitly incorporated within the THP by reference, the plan de facto incorporates the report by referring to it as the substantive basis for its site-mitigation measures. In effect, both the plan and CDF's response essentially say, "[s]ee the report" in reply to the issue of site mitigation; under these circumstances, the nondisclosure of the report is fundamentally unfair to the rights of the public. We therefore hold that although not specifically required to prepare a report, neither a logging company nor CDF may simply cite the report and fail to provide substantive, detailed responses to environmental objections regarding the report's subject matter. If the company or CDF rely on the report in this fashion and are unwilling to respond sufficiently to satisfy *Gallegos* without disclosure, then the report must be disclosed. Rex Tim-

ber's motives for not revealing the report, save for the fact that it was a "private" document, are less than clear.[17]

Failure to follow necessary procedures is a prejudicial abuse of discretion. EPIC alleges prejudice based on the perceived ambiguity of the THP's description of logging operations on or near the site. The plan provided that tractors would be kept out of the site "as flagged on the ground," but that an existing skid trail would be used for tractors. We agree with EPIC that this statement is ambiguous regarding whether tractors would be excluded from all or only part of the site ("as flagged on the ground"), and that it is unclear whether the tractors could invade the sanctity of the site by using the "existing skid trail" or skirt the site but drag logs across it, a concern voiced by EPIC. The way EPIC and other members of the public could have evaluated this proposed mitigation of site damage, in light of CDF's insufficient response to their objection, was to view the report itself.

## IV

We need not reach the other issues raised by the parties and amici curiae, including the issue of whether the trial court erred by limiting itself to the administrative record.[18] The order denying the petition for writ of mandate

---

[17]Respondents did advance a justification for nondisclosure based on the fear that if the site's location became public, it would be defiled by persons seeking souvenirs or artifacts. This concern is genuine, but has surfaced in a vacuum in this case. There has been no indication of any real danger of defilement. Certainly, appellants, who include a member of the very Native American nation who claims the site as a sacred ground, would be among the last to pose any danger to the sanctity of the site. There has been no indication that EPIC would have not acted responsibly in keeping the location of the site to itself had it received the archaeological report.

[18]Although we do not reach this issue, we note the inaccuracy of respondents' contention that the superior court did not in fact limit itself to the administrative record. Although some of the proffered evidence outside the record appears to have been technically admitted, the trial court's comments make it quite clear that it felt confined to the record, and would not consider the evidence in determining the issues before it. The testimony of Johnson, see footnote 9, *ante,* appears to have been originally offered not to exceed the scope of the record, but to "explain" the record by setting forth the procedures shown by the record to have been followed. The superior court did not consider the evidence proffered by EPIC that went beyond the record's scope.

In the typical administrative mandamus proceeding reviewing the decision of an administrative agency, the court is generally limited to the evidence in the administrative record. (Code Civ. Proc., § 1094.5.) The parties agree that since no public hearing was provided prior to the adoption of the THP, section 1094.5 did not apply, and EPIC's petition necessarily sounded in traditional mandamus under Code of Civil Procedure section 1085. Under that section, additional evidence is generally considered; traditional mandamus proceedings, however, usually review quasi-legislative decisions of an administrative agency, not quasi-judicial ones such as the decision to approve a THP. Whether in a case such as this, a petitioner should be denied a hearing at both the administrative and the judicial levels is a significant issue, but one which must await a more appropriate case.

is reversed, and the cause remanded with instructions to grant the petition and set aside the timber harvesting plan. This disposition renders moot EPIC's application for a preliminary injunction against the logging operation on the grove since the setting aside of the plan prevents any logging until a new plan has been proposed, evaluated and approved.

EPIC has requested an award of attorney fees under the private attorney general theory, as discussed and expanded in *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311 [193 Cal.Rptr. 900, 667 P.2d 704]. Respondents have not addressed this contention or disputed EPIC's entitlement to fees. We agree that a fee award is proper. On remand, the superior court shall conduct a hearing for the limited purpose of making a fee award under *Lucky Stores.* The stay of logging operations heretofore imposed shall remain in effect until the finality of this opinion.

King, J., and Haning, J., concurred.