Filed 10/19/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION et al., <br><br>     Defendants and Respondents, <br><br> VALENT U.S.A. CORPORATION et al., <br><br>     Real Parties in Interest. | A145632 <br><br> (Alameda County <br> Super. Ct. No. RG14731906) <br><br> ORDER MODIFYING OPINION <br> NO CHANGE IN JUDGMENT |


BY THE COURT:

It is ordered that the opinion filed herein on September 19, 2017, be modified as follows:

The "Environmental Baseline" section beginning on page 21 and continuing through page 24 is deleted.

On page 24, in the first sentence of the "Cumulative Impacts" section, the words "that is closely related to consideration of a meaningful project baseline" are deleted.

On page 30, in the second to last sentence of the "Recirculation" section, the words "any discussion of an environmental baseline or" are deleted.

The petitions for rehearing filed September 29, 2017 and October 4, 2017 are denied. The request for judicial notice filed on October 4, 2017 is denied. There is no change in the judgment.

1

Date: OCT 19, 2017                    McGuiness, P.J._____P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PESTICIDE ACTION NETWORK NORTH AMERICA et al., | |
| Plaintiffs and Appellants, | A145632 |
| v. | |
| CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION et al., | (Alameda County Super. Ct. No. RG14731906) |
| Defendants and Respondents, | |
| VALENT U.S.A. CORPORATION et al., | |
| Real Parties in Interest. | |

Defendant California Department of Pesticide Regulation (the Department), approved amended labels for two previously registered pesticides: Dinotefuran 20SG, manufactured by real party in interest Mistui Chemicals Agro, Inc. (Mitsui), and Venom Insecticide, manufactured by real party in interest Valent U.S.A. Corporation (Valent). The amended labels allowed both pesticides to be used on additional crops and allowed Venom Insecticide to be used in increased quantities. Both pesticides contain the active ingredient dinotefuran, which is from a class of pesticides called neonicotinoids. In approving the labels, the Department concluded uses of both pesticides in accord with the label amendments would cause no significant environmental effect on honeybees or the environment.

Plaintiff Pesticide Action Network North America (PANNA) filed suit challenging the approvals and alleging the Department violated the California Environmental Quality Act (CEQA) by approving the label amendments without sufficient environmental

3

review.  The trial court denied PANNA's writ petition, which PANNA appeals.  The record demonstrating the Department's efforts at environmental review here were deficient.  So, we reverse.

## BACKGROUND

### *The Department's Regulation of Pesticides*

The Department is responsible for regulating the distribution, sale, and use of pesticides in California.  State regulations seek to provide for the proper, safe, and efficient use of pesticides essential for food production; to protect public health and safety; and to protect the environment from harm by ensuring the proper stewardship of pesticide products.  (Food & Agr. Code, § 11501.)

All pesticides sold and used in California must be licensed or registered. (Food & Agr. Code, § 12811.)  Before a pesticide can be registered in California, it must first be registered by the United States Environmental Protection Agency (the EPA).  (7 U.S.C. § 136a.)  Once the EPA registers a pesticide, it is eligible for the Department's review.  The Department must thoroughly evaluate the pesticide to ensure that, when used in conformance with its labeling, it is effective and will not harm human health or the environment.  (Food & Agr. Code, § 12824.)

A pesticide that demonstrates "serious uncontrollable adverse effects either within or outside the agricultural environment," presents a "greater detriment to the environment than the benefit received by its use" or which has "a reasonable, effective, and practicable alternate material . . . less destructive to the environment" may not be registered.  (Food & Agr. Code, § 12825, subds. (a), (b), (c).)  The Department may also place appropriate restrictions on how, where and in what quantities any registered pesticide may be used. (Food & Agr. Code, § 12824.)  To remain valid, pesticide registrations must be renewed annually.  (Food & Agr. Code, § 12817.)

The Department also is obligated to continuously evaluate registered pesticides to ensure they pose no danger to the environment.  (Food & Agr. Code, § 12824.)  The Department must investigate "all reported episodes and information [it receives] that indicate a pesticide may have caused, or is likely to cause, a significant adverse impact,

4

or that indicate there is an alternative that may significantly reduce an adverse environmental impact. If the Director finds from the investigation that a significant adverse impact has occurred or is likely to occur or that such an alternative is available, the pesticide involved shall be reevaluated." (Cal. Code Regs., tit. 3, § 6220.) The Department may cancel the registration of a pesticide it determines presents serious uncontrollable adverse effects to the environment. (Food & Agr. Code, § 12825.)

### *Neonicotinoids*

Neonicotinoids are a class of widely used pesticides subject to the Department's regulatory oversight. They are "systemic," meaning plants exposed to them readily absorb the chemicals which are distributed throughout the plant, including the tissues, pollen, and nectar. This is advantageous for controlling pests because neonicotinoids can protect all parts of the plant.

Neonicotinoids are classified into one of three chemical groups: nitroguanidines, nitromethylenes, and cyanoamidines. This case involves the nitroguanidine chemical group. It includes four chemicals: imidacloprid, thiamethoxam, clothianidin, and dinotefuran. Dinotefuran is the active ingredient in the two pesticide products at issue, Mistui's Dinotefuran 20SG and Valent's Venom Insecticide. Dinotefuran 20SG was first registered by the Department in June 2005, and its registration has been renewed annually since then. Venom Insecticide was first registered in March 2006 , and its registration has been renewed annually since then as well. A Mitsui-sponsored study from 2002 describes dinotefuran as "one of the most toxicologically benign and environmentally friendly synthetic insecticides ever developed for commercial use" with "the potential to replace more acutely toxic pesticide products and to reduce the risks to human health and the environment when compared to existing products." The labels for both products have carried warnings of their toxicity to honey bees since their initial registration.

### *Declining Bee Populations*

In 2006, the sudden and widespread decline of honey bees in the United States began to be reported as a phenomenon called "colony collapse disorder." This phenomenon is characterized by the sudden loss of worker adult bees from managed

hives, resulting in the eventual collapse of the entire bee colony within a few weeks. The 2012 "Report on the National Stakeholders Conference on Honey Bee Health," ("2012 Stakeholder Report"), observed that approximately 28 to 33 percent of United States honeybee colonies have failed each year since 2006, compared to a normal loss rate of 10 to percent.

This decline has been alarming and concerning to California's regulatory agencies. The Department has acknowledged, "Honeybees are vital to the pollination of many of California's agricultural crops, which are critical to our national food system and essential to the economy of the state." Improving the health of honey bee colonies is considered imperative to meet the demands of U.S agriculture for pollination and to ensure food security.

Scientists have embarked on an intensive level of research towards understanding the cause of honey bee colony collapse. Several possible causes for colony collapse disorder have been considered, and consensus appears to be building that "a complex set of stressors and pathogens is associated with [colony collapse disorder], and researchers are increasingly using multi-factorial approaches to studying causes of colony losses." The 2012 Stakeholder Report noted the "[a]cute and sublethal effects of pesticides on honey bees have been increasingly documented, and are a primary concern." It also explained colony collapse disorder "is a complex phenomenon because several factors seem to be interacting to cause [colony collapse]. [Citation.] The suspected factors include pests, pathogens, pesticides, nutritional deficiencies and bee hive management practices."

### *The Department's Neonicotinoid Reevaluation*

Years ago, the Department received data showing a potential hazard to honey bees from pesticides containing the active ingredient imidacloprid, one of the neonicotinoids in the nitroguanidine chemical group. The data showed that imidacloprid could accumulate in plants at levels toxic to honeybees. In February 2009, on the basis of this information, the Department initiated a reevaluation of imidacloprid as well as clothianidin, thiamethoxam, and dinotefuran due to their "chemical and toxicological

6

similarities" to imidacloprid. Based on these 4 chemicals, 50 pesticide registrants and 282 pesticide products—including Dinotefuran 20SG and Venom Insecticide—became subject to reevaluation.

This reevaluation is underway. The Department has requested data, including additional pesticide safety studies, from neonicotinoid pesticide registrants in order to characterize the nature and extent of the potential hazard for the reevaluation. But as of late 2013, the Department had "not received *conclusive* evidence that neonicotinoids pose a significant threat to honeybees." Further, the results of its neonicotinoid monitoring studies on various crops as of late 2013 "have been inconclusive overall" but have led to further testing. Results from acute toxicity studies on honeybee larvae are under review by the Department.[1]

---

[1] In judicial notice requests dated February 16, 2016, and May 20, 2016, the Department seeks judicial notice of four documents, two of which are government reports related to both EPA and Department neonicotinoid reevaluation updates. No oppositions to the requests were filed, and we deferred ruling on the requests until a decision on the merits of the case. We now rule that the Department's requests for judicial notice are denied as to all documents.

Two of the documents not granted judicial notice are: (1) the Joint PMRA / USEPA Re-evaluation Update for the Pollinator Risk Assessment of the Neonicotinoid Insecticide, dated January 6, 2016; and (2) the Department's March 2016 Semiannual Report Summarizing the Reevaluation Status of Pesticide Products During the Period of July 1, 2015 through December 31, 2015. Both are government documents properly subject to judicial notice as official acts of the agency. (*Etcheverry v. Tri-Ag Serv., Inc.* (2000) 22 Cal.4th 316, 330–331; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 483.) However, both reports post-date the Department's June 2014 approval decision at issue in this appeal and were not relevant to that decision. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 (*Mangini*).)

The other two documents not granted judicial notice are the Order Denying Motion for Leave to File Amicus Brief, dated April 29, 2016, in *Ellis v. Bradbury* (N.D. Cal. No. 3:13-cv-01266-MMC) and PANNA's Further Request for Judicial Notice, filed in this action in the trial court on April 3, 2015. None of these documents are relevant to our analysis. (*Mangini*, *supra*, 7 Cal.4th at p. 1063.)

In September 2014, California enacted legislation intended to "ensure [the Department] completes a thorough, scientifically sound, and timely analysis of the effects of neonicotinoids on pollinator health." (Legis. Counsel's Digest, Assem. Bill No. 1789 (2013-14 Reg. Sess.) Ch. 578, p. 96.) The Legislature's findings noted agreement among scientists "that a combination of factors is to blame for declining pollinator health, including lack of varied forage and nutrition, pathogens and pests such as the Varroa mite, and chronic and acute exposure to a variety of pesticides." (*Ibid.*) The Department has until July 1, 2018, to issue a determination with respect to its neonicotinoid reevaluation. (Food & Agr. Code, § 12838, subd. (a).) Within two years of making its determination, the Department must "adopt any control measures necessary to protect pollinator health." (Food & Agr. Code, § 12838, subd. (b)(1).)

### *The Department's Public Reports for Amended Labels for Dinotefuran 20SG and Venom Insecticide*

On January 17, 2014, the Department released a public report for its proposed decision to approve an amended label for Venom Insecticide. The amendment sought to expand the product's use to additional types of crops (e.g., fruiting vegetables) and to allow its use in increased quantities.

On January 24, 2014, the Department released a public report for its proposed decision to approve an amended label for Dinotefuran 20SG. The label amendment sought to allow Dinotefuran 20SG to be used on additional crops (e.g., onions, peaches and nectarines) and to add pollinator protection language.

In each of the reports, the Department stated it "evaluated the new labels for their potential to create adverse environmental effects to human health, water, air, and non-target species (checklist). After review of the new labels for the above-identified registered products, [the Department] has determined that use of each product in a manner consistent with its new label will have no direct or indirect significant adverse environmental impact, and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment."

8

Earthjustice (PANNA's counsel here) and Dr. Eric C. Mussen of the University of California at Davis submitted comments during the review process. Dr. Mussen, focusing on the Venom Insecticide report, commented on the proposed new label's lack of warning of the potential risk of honey bees to consume dinotefuran in "chemigation water" and in contact with field applications. Earthjustice's comments were more extensive and expressed concern that expanded authorized use of both pesticides would have a profound and adverse impact on honey bees.

In June 2014, the Department evaluated the environmental concerns expressed by Dr. Mussen and Earthjustice. The Department stated it "performed a thorough scientific analysis of the label expansions for the products . . . . [The Department] has determined that all identified potential adverse environmental effects associated with the use of the products have been mitigated and the product's label instructions provide the necessary environmental protections. Therefore, approving the proposed label amendments does not represent additional risk to pollinators. Data indicate that neonicotinoids are acutely toxic to honey bees and other pollinators; however, [the Department] does not yet have sufficient scientifically robust data to support a regulatory action to implement additional mitigation measures, over and above current label restrictions." The Department joined its comments with notice of its final decision to approve the label amendments for both Dinotefuran 20SG and Venom Insecticide.

### PANNA's Challenge to Department Approvals

PANNA challenged the decisions in a petition for writ of mandate and complaint for declaratory and injunctive relief seeking an order "directing DPR to set aside its approval of Venom Insecticide and Dinotefuran 20SG pending the agency's reevaluation of neonicotinoids and compliance with CEQA." PANNA asserted several CEQA violations. It claimed the Department abused its discretion when it found the label amendments had no significant environmental effect; it failed to analyze the direct, indirect, and cumulative impacts of the new labels; and it failed to analyze project

9

alternatives.[2]  PANNA asked for "permanent injunctive relief prohibiting [the Department] from registering any neonicotinoid pesticide product or any other pesticide product that is toxic to honey bees, or from approving amended labels or registering new uses for existing neonicotinoids."  The trial court denied relief and entered judgment in the Department's favor.  PANNA appealed.

## DISCUSSION

### A. Standard of Review

Both parties agree that we "review[] the agency's action, not the trial court's decision." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard Area*).)

The parties also agree that our review of the Department's action for compliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.)  Such an abuse "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.)

This "statutory language has been interpreted as classifying abuses of discretion into two types of agency error—namely, legal error (the failure to proceed in the manner required by law) and factual error (making findings that are not supported by substantial evidence). [Citation] [¶] Each type of error is subject to a different standard of judicial review." (*POET, LLC v. Air Resources Board* (2013) 218 Cal.App.4th 681, 710–711 (*POET*).)  For this reason, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area, supra,* 40 Cal.4th at p. 435.)  When the claim is legal error, we conduct an independent review to determine whether

---

[2] In its fourth cause of action, PANNA asserted a violation of the Food & Agricultural Code for the Department's alleged failing to conduct the neonicotinoid reevaluation in a timely manner.  Based on the 2014 enactment of Food and Agricultural Code section 12838, subdivision (a), which established the timeline for the Department's completion of the reevaluation, PANNA dismissed this cause of action without prejudice. PANNA confirms this cause of action is not part of this appeal.

10

the agency proceeded in the manner required by law.  (*Id.* at p. 426.)  On the other hand, when reviewing an agency's factual determination for error, we apply the substantial evidence standard.  (*Ibid.*)

### *B.  CEQA's Application to the Department's Decisions*

Before we can determine whether the Department violated CEQA, we must decide the extent to which CEQA applies to the Department's decisions to approve pesticide labeling.

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment.  [Citation.]  In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties.  [Citations.]  CEQA is to be interpreted to 'afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*).)

In general, CEQA "requires various state and local governmental entities to submit environmental impact reports before undertaking specified activity.  These reports compel state and local agencies to consider the possible adverse consequence to the environment of the proposed activity and to record such impact in writing." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 254–255, disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888.)  "Under CEQA, the 'lead agency . . . is responsible for conducting an initial study of the project to determine whether it may have a significant effect on the environment.  If it is found that the project will have no significant effect on the environment, a negative declaration is prepared, describing the project and indicating that it will have no significant effect.' [Citation.]  On the other hand, if the initial study indicates that the project may have a significant effect on the environment, the lead agency must prepare an [environmental impact report (EIR)]. . . . The EIR must include a detailed statement concerning the environmental effects, alternatives and other relevant factors concerning the project." (*Committee for a*

*Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 856–857.)

Pursuant to Public Resources Code section 20180.5, state regulatory programs which meet certain environmental requirements and are certified by the Secretary of the Resources Agency are exempt from some of the usual CEQA requirements. (Pub. Resources Code, § 21080.5.) There is no mandate for such programs to prepare initial studies, negative declarations, and EIRs. (Cal. Code Regs., tit. 14, § 15250.)[3] Public Resources Code section 21080.5, subdivision (a) states that when a certified program requires environmental documentation to be submitted in support of certain activities "the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division." (Pub. Resources Code, § 20180.5, subd. (a).) Accordingly, a certified program may use other documents which "are considered the 'functional equivalent' of documents CEQA would otherwise require" (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1422 (*City of Arcadia*)) and which serve as "substitute document[s] for the normal environmental review papers. [Citation.]" (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 930–931 (*Ross*).) "The rationale for this rule is to avoid the redundancy that would result if environmental issues were addressed in both program-related documents and an EIR." (*POET*, *supra*, 218 Cal.App.4th at p. 710.)

In 1979, the Secretary of the Resources Agency certified the Department's regulatory program related to the "registration, evaluation, and classification of pesticides." (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1059 (*Californians for Alternatives*).) The Code of Regulations identifies the Department's pesticide program as one "certified . . .

---

[3] Title 14, section 15000 et seq. of the California Code of Regulations codifies the CEQA Guidelines, the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083) and "prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (Cal. Code regs., tit. 14, §§ 15000 et seq.)

12

as meeting the requirements of Section 21080.5." (Cal. Code Regs., tit. 14, § 15251, subd. (i).) "The Legislature found certification warranted, in part, because the 'preparation of environmental impact reports and negative declarations for pesticide permits would be an unreasonable and expensive burden on California agriculture and health protection agencies.' " (*Californians for Alternatives*, *supra*, 136 Cal.App.4th at p. 1059.)

Elements of the Department's certified program can be found in title 3 of the California Code of Regulations, section 6254, which describes the documentation the Department must prepare for a registration decision. (Cal. Code of Regs., tit. 3, § 6254.) This public report must include "a statement of any significant adverse environmental effects that can reasonably be expected to occur, directly or indirectly, from implementing the proposal, and a statement of any reasonable mitigation measures that are available to minimize significant adverse environmental impact." (Cal. Code of Regs., tit. 3, § 6254.) It must also contain "a statement and discussion of reasonable alternatives which would reduce any significant environmental impact." (Cal. Code of Regs., tit. 3, § 6254.)

PANNA and the Department disagree on what the exemption from CEQA means, and the import of the Department's processes for environmental review of the pesticide label amendments for Dinotefuran 20SG and Venom Insecticide. Notwithstanding the certification and exemption from formal CEQA requirements, PANNA contends the Department's review must still comply with CEQA's policy goals and substantive standards. Because it operates a certified regulatory program, the Department contends its environmental documents serve as the "functional equivalent" of CEQA documents and are otherwise exempt from CEQA's substantive requirements. Moreover, it contends that certification of its pesticide program represents a determination that its own environmental review procedures were adequate and that CEQA compliance must be measured against these procedures, with which it has complied.

13

While the Department correctly states its program documents may be used in lieu of the documents normally prepared under CEQA, it goes too far in asserting its regulatory program "is exempt from the substantive portions of CEQA."

The plain language of Public Resources Code section 21080.5 makes the limited scope of the exemption apparent. Subdivision (c) identifies the specific CEQA provisions from which certified programs are exempt: "A regulatory program certified pursuant to this section is exempt from Chapter 3 (commencing with Section 21100), Chapter 4 (commencing with Section 21150), and Section 21167, except as provided in Article 2 (commencing with Section 21157) of Chapter 4.5." (Pub. Resources Code, §§ 21080.5, subd. (c).)

The CEQA Guidelines also dissuade us from the broad exemption the Department urges for certified programs. The same CEQA Guideline which confirms that certified regulatory programs are "exempt from the requirements for preparing EIRs, negative declarations, and initial studies" immediately explains, "A certified program *remains subject to the other provisions in CEQA* such as the policy of avoiding significant adverse effects on the environment where feasible." (Cal. Code regs., tit. 14, § 15250, italics added.)

The California Supreme Court has explained the limits of the certified-program exemption. In *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215 (*Sierra Club*), the Board of Forestry approved two timber harvest plans (THPs) for certain old-growth forests, through its certified regulatory program for timber harvesting operations, after finding no significant adverse effect on old-growth dependent species. (*Id.* at p. 1219.) The Supreme Court concluded the board abused its discretion when it evaluated and approved the THPs on the basis of a record that lacked information that other involved agencies had deemed necessary regarding the presence of old-growth dependent species. (*Id.* at p. 1220.) The Court found the board had an obligation imposed by CEQA to collect such information, without which it could not identify the environmental impacts of a project or carry out its obligation to protect wildlife. (*Id.* at p. 1236.) The Court rejected the lumber company's argument that timber harvesting was exempt from CEQA

14

because it was a certified regulatory program, explaining, "Our conclusion rests on the fundamental assumption that in approving [THPs], the board must conform not only to the detailed and exhaustive provisions of the [applicable regulations], but also to those provisions of CEQA from which it has not been specifically exempted by the Legislature." (*Id.* at p. 1228.) It concluded, "Section 21080.5 compels instead the conclusion that timber harvesting in this state is exempt only from chapters 3 and 4 of CEQA and from section 21167 of that act." (*Id.* at p. 1231.)

The decision in *Sierra Club* reinforced an earlier decision reached by the First District in *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604 (*EPIC*), which explained the limits of the exemption granted to certified programs. *EPIC* stated, "Chapters 3 and 4 are in large part procedural elements of the EIR process. A certified program under section 21080.5 is logically exempted from their coverage as such programs provide an alternative to an EIR. Section 21167 is specifically geared to the machinery of the EIR process, and the application of any of its provisions to the THP approval process would be superfluous. Section 21080.5 contains its own time limitation for judicial action challenging a decision made under a functionally equivalent regulatory program. The logic of exempting these sections from the process declared to be an acceptable alternative to EIR preparation is apparent." (*Id.* at pp. 617–618.) By making these specific exemptions, the *EPIC* court found "the Legislature has manifested an intent to retain the applicability of the other provisions of CEQA and of the Guidelines, particularly the substantive criteria and the specific aspects of environmental effect that must be evaluated before a project may proceed. . . . [¶] . . . [¶] While section 21080.5 may allow the industry to prepare abbreviated project plans instead of full-blown EIRs, it does not except the industry from adhering to the broad policy goals of CEQA as stated in section 21000, and to CEQA's substantive standards designed to fulfill the act's goal of long-term preservation of a high quality environment for the citizens of California. [Citations.]" (*Id.* at pp. 618, 620.) *EPIC* clarifies that "[n]othing in section 21080.5 supplies a basis for concluding that the Legislature intended the section to stand as a blanket exception from CEQA's thorough statutory

15

scheme and its salutary substantive goals." (*Id.* at p. 618.) The court held, "[E]xcept for the specific exemptions discussed, CEQA and its substantive criteria for the evaluation of a proposed project's environmental impact apply." (*Id.* at p. 620.)

We must reach the same conclusion as *Sierra Club* and *EPIC* that the Department's pesticide registration program is exempt only from CEQA chapters 3 and 4 and from Public Resources Code section 21167. Otherwise, the Department's program— and the environmental review documents it prepares—remain subject to the broad policy goals and substantive standards of CEQA not affected by the limited exemption set forth in section 21080.5, subdivision (c). (See *POET*, *supra*, 218 Cal.App.4th at p. 714; *City of Arcadia, supra*, 135 Cal.App.4th at p. 1422.)

To support its argument that adhering to its own certified environmental review process is enough to satisfy CEQA, the Department embraces the finding in *Californians for Alternatives*, *supra*, 136 Cal.App.4th 1049, that "the Department's compliance with applicable statutes and regulations constitutes CEQA compliance." (*Id.* at p. 1067.) However, *Californians for Alternatives* concerned a CEQA challenge related to the Department's procedure for annually renewing registered pesticides and whether the Department had to annually reopen the review for public comment as part of the renewal process. (*Id.* at p. 1055) Neither CEQA nor the Department's regulations required the Department to do so. (*Id.* at p. 1066.) But this case concerns the adequacy of the Department's environmental review documents under both the certified program's regulations and the substantive requirements of CEQA. Notably, even *Californians for Alternatives* acknowledged the certification of a regulatory program amounted to an "exempt[ion] from several CEQA *procedural* requirements." (*Id.* at p. 1067, italics added.) The *Californians for Alternatives* court did not address CEQA's substantive requirements, nor does it bear on those substantive requirements at issue in this appeal.

The Department's reliance on *Mountain Lion, supra*, 16 Cal.4th 105, is also unavailing. The Department contends PANNA's position directly conflicts with *Mountain Lion*, which recognized that a certified program's environmental documentation serves as a functional equivalent of an EIR. (*Id.* at p. 113.) Our

16

conclusion does not diminish the significance of environmental review documents from certified programs as functionally equal to an EIR, nor does it require the Department to prepare full EIRs for every action it takes. Rather, consistent with statutory language, the Department's environmental review is not a "blanket exemption" from CEQA, and it may not be relieved of CEQA's substantive requirements to thoroughly evaluate specific environmental effects before it approves an activity. Even the Supreme Court in *Mountain Lion* recognized "[a]n agency operating pursuant to a certified regulatory program must comply with *all of CEQA's other requirements*." (*Id.* at p. 114, italics added.)

### C. The Department's Compliance with CEQA's Substantive Requirements

Since the Department's certified regulatory program remains subject to the broad policy goals and substantive requirements of CEQA, we next address whether the Department's public reports approving the pesticide label amendments comply with those requirements and the other content requirements for environmental documentation from a certified program. PANNA identifies multiple deficiencies in the Department's review. Although the Department may prepare abbreviated environmental review documents that serve as the functional equivalent of what CEQA would normally require, its review remains subject to CEQA's policy goals and substantive standards. To determine whether the Department's public reports were adequate, we turn to the statutes and regulations containing the policy goals, substantive standards, and content requirements for a certified program's environmental documents.

CEQA's broad policy goals are set forth in Public Resources Code sections 21000 through 21006. Many of the goals are expressed in legislative findings and declarations in very general terms. (E.g., Pub. Resources Code, § 21001 ["The Legislature . . . declares that it is the policy of the state to: [¶] (a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state."].) Several, however general, are relevant for this appeal. The substantive standards with which the Department's documentation must comply are found throughout CEQA, outside of the exemptions in

17

CEQA Chapters 3 and 4 and Public Resources Code section 21167 (the procedural EIR). Public Resources Code section 21080.5 specifies the content required in environmental review documents prepared by a certified regulatory program. The CEQA Guidelines in section 15000 et seq. of title 14 of the California Code of Regulations provide additional content requirements for a certified program's substitute documentation. Finally, the regulations adopted by the Department to secure certification appear in section 6254, title 3 of the California Code of Regulations.

We will identify and apply the specific, relevant standards to the Department's public reports to evaluate the sufficiency of the record supporting the Department's review. We recognize substantial parts of PANNA and the Department's briefing debate whether the Department's public reports either embody the EIR process or have no resemblance to an EIR and are the equivalent of a negative declaration. As the court in *Ross*, *supra*, 199 Cal.App.4th 900, noted, "No doubt, there is an overlap between the requirements of a substitute document prepared for use in a certified regulatory program and those applicable to the preparation of an environmental impact report. We need not describe in detail how the requirements for a negative declaration or an environmental report, on one hand, and a certified program substitute document, on the other, differ or are the same." (*Id.* at p. 933.) Rather, we "apply the statutory and regulatory requirements" specified in applicable CEQA statutory provisions and guidelines to determine the sufficiency of a certified program's environmental review documents. (See *id.* at pp. 930–944.) When we do, we conclude the Department's public reports for Dinotefuran 20SG and Venom Insecticide failed to comply with what CEQA requires for certified regulatory program substitute documents.[4]

---

[4] PANNA claims additional deficiencies in the Department's public reports which do not factor into our conclusion. In a footnote, PANNA argues that the Department failed to describe all the crops affected by the proposed use expansion and that it concealed the increased quantities of pesticide allowed to be used under the amended label for Venom Insecticide. PANNA also criticizes the Department's "short response" to its "extensive written comments and accompanying scientific studies" as "not detailed enough." As we have noted, "an agency operating pursuant to a certified regulatory

PANNA contends the Department's reports "perhaps most glaringly" failed to address any feasible alternative to registering the proposed new uses for Dinotefuran 20SG and Venom Insecticide. We agree.

Our Supreme Court has held that in a review conducted under a certified regulatory program, "the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 134.) Indeed, consideration of alternatives is one of the hallmarks of CEQA analysis. Public Resources Code section 21001, subdivision (g) declares it is the policy of the state to "[r]equire governmental agencies . . . to consider alternatives to proposed actions affecting the environment." (Pub. Resources Code, § 21001, subd. (g).) Public Resources Code section 21002 states that "it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives . . . available which would substantially lessen the significant environmental impacts of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying . . . feasible alternatives . . . which will avoid or substantially lessen such significant effects." (Pub. Resources Code, § 21002.) Content requirements for the documentation of a certified program must include "a description of the proposed activity with alternatives to the activity." (Pub. Resources Code, § 21080.5, subd. (d)(3)(A).) This is reflected in the Department's own program regulations which state that "[e]ach public report [prepared by the Department] shall also contain a

---

program is subject only to certain abbreviated CEQA requirements." (*W.M. Barr & Co. v. South Coast Air Quality Management Dist.* (2012) 207 Cal.App.4th 406, 408, fn. 6). Further, "[r]esponses to comments need not be exhaustive; they need only demonstrate a 'good faith, reasoned analysis.' " (*Eureka Citizens for Responsible Government v. Eureka* (2007) 147 Cal.App.4th 357, 378.) For substitute, abbreviated documents in lieu of the normal environmental review reports, the Department's public reports' summary descriptions of the proposed label amendments were sufficient, and the Department's responses to public comments contained enough detail on significant environmental points raised to understand the extent of the Department's analysis.

statement and discussion of reasonable alternatives which would reduce any significant environmental impact." (Cal. Code Regs., tit. 3, § 6254.)

The CEQA Guidelines also call for analysis of alternatives in any functionally equivalent document prepared in a certified program: "The document used as a substitute for an EIR or negative declaration in a certified program shall include [¶] . . . [¶] [e]ither [¶] "(A) Alternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment, or [¶] (B) A statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion." (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A) & (B).) Thus, "a legally sufficient [environmental review document] must include some consideration of feasible alternatives even if the project's significant environmental impacts will be avoided through mitigation measures." (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1395.)

The record here fails to address these requirements on multiple levels. Based on our review of the Department's documentation, the Department made no effort to analyze alternatives to the expanded use of either Dinotefuran 20SG or Venom Insecticide. Neither report described any feasible alternatives to the proposed activities including a "no project" alternative. The Department's public reports for both pesticides are clear that "no alternatives . . . [were] proposed," and the Department's final decision confirmed this.

The Department responds that under its regulations, it need only consider alternatives when it has found significant environmental impacts. Indeed, the Department expressed this position in its reports: "After review of the new labels for the above-identified registered products, [the Department] has determined that use of each

20

product in a manner consistent with its label will have no direct or indirect significant adverse environmental impact, and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment." At oral argument, to further substantiate this determination, the Department referenced a 2010 Mitsui-sponsored study in the record which concluded application of dinotefuran on cotton plants had no adverse effects on honeybees. We are nonetheless perplexed how the Department could reach such a conclusion given since 2009 dinotefuran has been subject to reevaluation under the Department's regulations, which require reevaluation when a substance "may have caused, or is likely to cause, a significant adverse impact, or that indicate there is an alternative that may significantly reduce an adverse environmental impact." (Cal. Code Regs., tit. 3, § 6220.) The reevaluation of neonicotinoids—including dinotefuran—continues.

To reconcile its reevaluation with its approvals of the Dinotefuran 20SG and Venom Insecticide label amendments, the Department contrasts the regulatory standard for reevaluation with the standard for determining when there are significant environmental impacts. Rejecting PANNA's contention that the fair argument standard the Department acknowledges applies to reevaluation also applies to its registration decisions, the Department states the term "fair argument" appears nowhere in its certified program regulations. It notes the phrase "*may have a significant environmental effect*" which provides the statutory basis for the fair argument standard for reevaluation appears nowhere in its regulations. The Department contends the specific language of its certified program regulations requires the Department only to discuss "any significant adverse environmental effect that *can reasonably be expected to occur*, directly or indirectly, from implementing the proposal." (Cal. Code Regs., tit. 3, § 6254, emphasis added.) Like the trial court, we are not persuaded and see distinctions without a difference. The Department's regulations which require review when a significant adverse effect "can reasonably be expected to occur" is not meaningfully different from CEQA regulations imposing a fair argument review when an activity "may have a significant environmental effect." The Supreme Court has noted that under the CEQA Guidelines, "[I]t is

21

appropriate for agencies to apply the fair argument standard in determining whether there is a reasonable possibility of a significant effect on the environment." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1115.) There is nothing distinctive about the specific language in the Department's program regulations which give us reason to refrain from applying the fair argument standard to its pesticide registration decisions as well as its decisions to reevaluate pesticides previously approved.

But even if the Department's finding of no significant impacts was meaningfully derived, it does not excuse the Department from showing how it reached its conclusion. In such circumstances, "a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion" is needed. (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A) & (B).) Both public reports refer to a "checklist" evaluation of the label amendments for their potential to create adverse environmental impacts, but we found no checklist in the record and the public reports reveal nothing of the Department's study. At oral argument, the Department's counsel represented that Department staff used a checklist in their analysis but could not provide an explanation why the analysis was not in the record. Counsel for one of the real parties in interest explained the absence of any physical checklist in the context of the more than 10,000 pesticide registration applications the Department must process each year and the systematic, continuous nature of the Department's review process which here was to amend to two long-standing registrations to add uses familiar to the Department. We appreciate the tremendous task before the Department and recognize the utility and suitability of its certification. While that certification justifies the exemptions from CEQA's procedural requirements, it does not excuse the Department from CEQA's substantive requirements or explaining its analysis, as we have discussed, without an adequate record, even for amended label applications. This is especially the case here, where the Department decided to reevaluate the products several years after its original registration decisions on the concern such products may cause or are likely to cause significant environmental effects.

22

We also reject the Department's contention that PANNA had the burden to identify feasible alternatives. "Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives." (*Mountain Lion*, *supra*, 16 Cal.4th at p. 134.) The Department failed to demonstrate that it meaningfully considered alternatives to the requested label amendments, and its approval of the labels without having done so was an abuse of discretion.

### *Environmental Baseline*

PANNA also contends the Department failed to assess baseline conditions with respect to actual use of neonicotinoids in California. We agree that the Department's environmental documents lacked adequate baseline information.

Baseline commonly refers to the requirement that an EIR "must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published." (Cal. Code Regs., tit. 14, § 15125.) This description of existing environmental conditions ordinarily serves as the "baseline" for measuring the changes to the environment that will result from the project and for determining whether those environmental effects are significant. (Cal. Code Regs., tit. 14, § 15125.) Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular use and the physical impacts thereof are considered to be part of the existing environmental baseline. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 320–323, 326–328 (*Communities for a Better Environment*).) "Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." (*Id.* at p. 328.)

Neither party has cited and we have found no reported decision that imposes CEQA baseline requirements on a certified regulatory program's environmental documents. The Department never argues that its certified program is exempt from this requirement. But our conclusion that the Department's abbreviated environmental documents must nonetheless assess baseline conditions is consistent with those CEQA policy goals and substantive standards from which certified regulatory programs are not exempt. (Cal. Code Regs. tit. 14, § 15250.) The policy underlying CEQA is set forth in part in Public Resources Code section 21002, which provides that "the procedures required [by CEQA] are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (Pub. Resources Code, § 21002.) This policy is supplemented by CEQA's guidelines, which identify as one of its basic purposes to "[i]nform government decision-makers and the public about the potential, significant environmental effects of proposed activities." (Cal. Code Regs., tit. 14, § 15002, subd. (a)(1).) To give effect to the policy of identifying significant adverse effects of a proposal, an EIR "must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified." (*Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439, 447.) The same need for a delineated baseline applies with equal force to a certified regulatory program's environmental documents which also must assess any significant adverse environmental effects of a project.

The Department says that it acknowledged and assessed baseline conditions and refers to its response letter to public comments which explain that no new significant impacts will result because "the uses are already present on the labels of a number of currently registered neonicotinoid containing products" The Department further refers us to hundreds of pages in the record regarding "the mountains of data about actual use" of the other registered neonicotinoids to demonstrate its analysis of a meaningful baseline.

24

While the Department has the discretion to decide how the baseline can be measured, it is not apparent from this mass of data that the Department ever conducted any such analysis. "The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." (Cal. Code Regs., tit. 14, § 15125, subd. (a).) Here, the entirety of the Department's baseline assessment related to the expanded use of the two pesticides throughout California is a single statement in its public comments that notes "the uses are already present on the labels of a number of currently registered neonicotinoid containing products." This general statement says nothing about the contours of the baseline relied upon by the Department. Whether the Department relied on actual existing uses of neonicotinoids or "hypothetical numbers," as PANNA contends, and in what quantities is not clear. In the absence of any meaningful discussion of baseline conditions, we cannot conclude that possible significant environmental impacts resulting from the proposed label amendments were "adequately investigated and discussed." (See Cal. Code Regs., tit. 14, § 15125, subd. (c).) Simply because the Department "had mountains of data about actual use" of other neonicotinoids does not mean it actually used that data to define a baseline or to inform its conclusions, and there is nothing in the record that reflects it actually did so.

The Department says there is no requirement it had to "publicly identify or describe" its baseline under its regulations. We disagree. The Department's regulations and its certified regulatory program do not exempt it from the policy goals and substantive standards of CEQA. One such policy is to "[i]nform government decisionmakers and the public about the potential, significant environmental effects of proposed activities." (Cal. Code Regs., tit. 14, § 15002, subd. (a)(1).) By withholding adequate information on its selected baseline, the Department obscures any prospect that the public will be able to ascertain the significant effects of a proposed project or whether a project will have no significant effects, as the Department concluded here. (See *Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 328 [without comparing proper baseline conditions with conditions expected to be produced by a project, EIR

25

"will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates"].)  In this case, the Department's reports contained no information on the baseline used for determining environmental impacts.  This constituted a failure to proceed in the manner required by law.

### Cumulative Impacts

A substantive CEQA requirement that is closely related to consideration of a meaningful project baseline is the assessment of a project's cumulative impacts on the environment.  This concept considers the incremental effect a proposed approval may have when viewed in connection with past, current or future approved projects.  PANNA contends the Department's documentation does not show that it considered whether the impact to honey bees associated with registering new uses for the two insecticides would be cumulatively considerable.  Again, we agree.

Whether a cumulative impacts analysis is required in a certified program's documentation is not as readily apparent as the requirement to consider reasonable alternatives.  The broad policy goals of CEQA in Public Resources Code sections 21000 et seq. do not refer to cumulative impacts.  (See Pub. Resources Code, § 21000 et seq.)  Section 21080.5, which sets forth the content requirements for certified program documentation, also makes no reference to a cumulative impacts analysis.  (See Pub. Resources Code, § 21080.5.)  And the Department's certified program regulations are silent on this point.  (See Cal. Code Regs., tit. 3, § 6254.)  But case law makes clear such an analysis is an integral part of a program's evaluation process.

In *Laupheimer v. State of California* (1988) 200 Cal.App.3d 440 (*Laupheimer*), the plaintiffs petitioned for a writ of mandate to prevent the logging of a neighboring property pursuant to a THP approved by the California Department of Forestry.  (*Id.* at pp. 447–448.)  The plaintiffs argued that the approvals were improper because the agency had not undertaken a cumulative impacts analysis, and the court reviewed the agency's obligation to consider such cumulative impacts as part of its certified timber harvesting program.  (*Id.* at p. 460.)

26

Observing that Public Resources Code section 21080.5 and the Department'sown regulations imposed no obligation to review cumulative impacts (*Laupheimer, supra*, 200 Cal.App.3d at pp. 461–462), the court identified the cumulative-impacts requirement in Public Resources Code section 21083, which provides that where "[t]he possible effects of a project are individually limited but cumulatively considerable" an evaluation shall "require a finding that a project may have a 'significant effect on the environment.' " (Pub. Resources Code, § 21083, subd. (b)(2).) " '[C]umulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Pub. Resources Code, § 21083, subd. (b)(2).) *Laupheimer* found more references to cumulative impacts in the CEQA Guidelines, including the requirement that "significant" cumulative impacts be discussed in EIRs (*Laupheimer, supra*, at p. 460) and a more detailed definition of the term: " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. [¶] (a) The individual effects may be changes resulting from a single project or a number of separate projects. [¶] (b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Cal. Code Regs., tit. 14, § 15355.)

Noting the agency's exemption from the EIR requirement as a certified regulatory program, *Laupheimer* asserted "the specific cumulative-impact provisions of the Guidelines cannot be said to be directly applicable" to its THP. (*Laupheimer, supra*, 200 Cal.App.3d at p. 462.) But as the court in *EPIC*, *supra*, 170 Cal.App.3d at p. 625, had done, *Laupheimer* reasoned "that CEQA's specific-cumulative impact provisions constitute recognition of the abstract significance of cumulative impacts to an environmental inquiry, and that in this abstract sense significant cumulative impacts must be considered in the course of *any* environmental inquiry subject to CEQA's broad policy

27

goals, whether or not also subject to CEQA's EIR requirements." (*Laupheimer*, *supra*, 200 Cal.App.3d at p. 462.) It added, "We cannot quarrel with the proposition that [the agency] as it exercises its regulatory functions under the Act and Rules, must consider each timber harvesting plan in its full environmental context and not in a vacuum." (*Ibid.*)

Having determined that consideration of cumulative impacts was necessary and important in "seeing the entire environmental picture," *Laupheimer* discussed the contours of such an analysis by a certified program. (*Laupheimer, supra*, 200 Cal.App.3d at p. 462) The court asserted the agency in every case had "to make at least a preliminary search for potential cumulative environmental effects, and if any such effect were perceived, at least a preliminary assessment of its significance." (*Id.* at pp. 462–463.) In circumstances disclosing "one or more significant potential cumulative effects, then [the agency] would be obliged to give careful consideration to those effects in determining whether . . . to approve the . . . plan." (*Id.* at p. 463.) Such an analysis requires the agency to "look[] for and in some reasonable manner assess[] potential cumulative environmental effects, and . . . [give] sufficient consideration to any such effect it should reasonably have considered significant." (*Id.* at p. 466.) Because the agency had not considered the potential cumulative effects of the timber harvesting plan, *Laupheimer* concluded there was an abuse of discretion.

Here, the Department also failed to explain its analysis of the cumulative impacts of registering new uses for the pesticides in the context of the Department's past, present, and future decisions regarding neonicotinoid use in California. Neither the public reports or the final decision contained cumulative impacts analysis. The single record reference we found to such an analysis appears in the Department's May 2014 response to Earthjustice, noting in conclusory fashion that the "crops added to the two dinotefuran products [at issue here] will not result in new significant direct, indirect and cumulative impacts to honeybees because the uses are already present on the labels of a number of currently registered neonicotinoid containing products."

But "the cumulative impact analysis must be substantively meaningful." (*Joy Road Area Forest and Watershed Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 676 (*Joy Road*).) " ' "A cumulative impact analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. [Citation.]" [Citation.] [¶] While technical perfection in a cumulative impact analysis is not required, courts have looked for "adequacy, completeness, and a good faith effort at full disclosure." [Citation.]' [Citation.]" (*Ibid.*) Even under the more relaxed expectation for such an analysis described by *Laupheimer*, the Department's one-sentence response lacked facts and failed to provide even a brief explanation about how the Department reached its conclusion.

This is not surprising given the Department's approach appears to have been to simply put off altogether considering the cumulative effects of approving additional and increased uses of dinotefuran-containing pesticides until the reevaluation is complete. The Department revealed as much in its response to Earthjustice when it stated, "The determination of whether the use of neonicotinoid products is resulting in adverse effects that require additional mitigation will be addressed by the reevaluation. The two amended dinotefuran products are already included in [the Department's] evaluation." The promise of more analysis to come following the conclusory explanation here simply does not measure up to CEQA's mandate that relevant information on the effects of a project be made available as soon as possible and presented in a way that is useful to decisionmakers and the public. (Pub. Resources Code, §§ 21001, subd. (b), 21003.1, sub. (b).)[5]

---

[5] The Department's failure to meaningfully consider cumulative effects at this juncture strikes us as a serious misstep, as its consideration of cumulative effects seems critical given past, current, and probable future approvals of neonicotinoid products. We note that in 2012 and 2013, during the Department's ongoing neonicotinoid reevaluation,

The Department did not proceed as required by law and abused its discretion when it approved the amended labels without considering the cumulative effects of its decision.

### *Recirculation*

Public Resources Code section 21003.1, subdivision (b) provides that "[i]nformation relevant to the significant effects of a project, alternatives, and mitigation measures which substantially reduce the effects shall be made available as soon as possible by lead agencies, other public agencies, and interested persons and organizations." (Pub. Resources Code, § 21003.1, subd. (b).) Further, section 21092.1 also provides, that "[w]hen significant new information is added to an environmental impact report after notice has been given . . . and consultation has occurred . . . but prior to certification, the public agency shall give notice again . . . and consult again . . . before certifying the environmental impact report." (Pub. Resources Code, § 21092.1.) In *Joy Road, supra*, 142 Cal.App.4th 656, the court held the certified regulatory program exemption from CEQA requirements did not extend to these recirculation provisions. (*Id*. at p. 668.)

However, "[r]ecirculation based on the addition of new information after the close of the public comment period is not required unless that information is 'significant.' [Citation.] The information is not considered significant unless the document 'is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or

the Department "issued twelve final decisions which either registered new agricultural products containing neonicotinoid active ingredients or registered label amendments for existing products containing neonicotinoid active ingredients," which either added new crop sites or new target pests for the neonicotinoid product. One expert report concluded that "annually increasing use of neonicotinoids may be playing a role in driving [bee] declines." We also reject any Department effort to minimize cumulative impacts of its approvals based on the presence of other products on the market for the same crops. "Focusing on the de minimis effect in absolute terms isolates the effect individually, and this runs counter to the combined approach that CEQA cumulative impacts law requires." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 121.)

avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement.' [Citation.] '[R]ecirculation is not required where the new information added to the EIR "merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR." [Citation.] On the other hand, recirculation is required, for example, when the new information added to an EIR discloses: (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented [citation]; (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance [citation]; (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt [citation]; or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless [citation]." (*Center for Biological Diversity v. California Dept. of Forestry & Fire Protection* (2014) 232 Cal.App.4th 931, 949.)

Here, in light of the Department's pending neonicotinoid reevaluation, its initial public reports for Venom Insecticide and Dinotefuran 20SG were both so inadequate and conclusory that public comment on the draft was effectively meaningless. Neither analysis in the January 2014 public reports exceeded a few pages. As discussed, both reports referred to a "checklist" evaluation of the label amendments for their potential to create adverse environmental impacts, but no checklist accompanied the report or is found in the record. For both products, the Department reached the same conclusion that there would be no significant adverse environmental impacts if the products are used in a manner consistent with the labels. But the Department provided no analysis or explanation to show how it reached that conclusion. Further, it made no attempt to discuss this conclusion in the context of its decision to reevaluate neonicotinoids on the basis that they "may have caused, or [are] likely to cause, a significant adverse impact, or that indicate there is an alternative that may significantly reduce an adverse environmental impact." (Cal. Code Regs., title 3, § 6220.) As analyzed above, neither

31

report described alternatives to the proposed activities nor did they include any discussion of an environmental baseline or an assessment of cumulative impacts. Given the Department refrained from explaining its decision until it responded to public comments, recirculation was required to allow meaningful public comment directed at the rationale for its decision.

## DISPOSITION

The judgment denying PANNA's writ of mandate is reversed. The judgment is remanded to the superior court with instructions to issue a writ of mandate directing the Department to rescind its June 13, 2014 approval of the Dinotefuran 20SG and Venom Insecticide label amendments.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.


_____
Pollak, J.

*Pesticide Action Network North America v. California Dept. of Pesticide Regulation*,
A145632

Trial Court:                                    Alameda County Superior
                                                Court


Trial Judge:                                    Hon. George C. Hernandez, Jr.


Counsel:

Earthjustice, Gregory C. Loarie, Tamara T. Zakim, Stacey Putnam Geis for Appellants.

Vic Sher Law, Victor M. Sher for Pollinator Stewardship Council as Amicus Curiae on behalf of Appellants.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Gaving G. McCabe, Supervising Deputy Attorney General, Marc N. Melnick, Deputy Attorney General for Respondents California Department of Pesticide Regulation, Brian H. Leahy, and Ann N. Prichard.

Kahn, Soares, & Conway, George H. Soares, Ann M. Grottveit for Respondents California Citrus Mutual, California Fresh Fruit Association, Western Agricultural Processors Association, California Cotton Ginners and Growers Association, Western Plant Health Association, and CropLife America.

Quinn Emanuel Urquhart & Sullivan, J.D. Horton, Jonathan Cooper for Real Party in Interest Mitsui Chemicals Agro, Inc.

Dentons US, Stanley W. Landfair, Lawrence S. Ebner, E. Jacob Lubarsky for Real Party in Interest Valent U.S.A. Corporation.